STATE of Tennessee, Appellee,

v.

John Eric JOHNSON, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

April 7, 1995.

Permission to Appeal Denied by Supreme Court Sept. 5, 1995.

**462**

Mark C. Scruggs, Nashville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Kathy Morante, Deputy Attorney General, Criminal Justice Division, Nashville, and Paul DeWitt, Asst. District Attorney General, Nashville, for Appellee.

## OPINION

WADE, Judge.

The defendant, John Eric Johnson, was convicted of second degree murder in the Criminal Court for Davidson County. The trial court imposed a Range I sentence of twenty-five years. The defendant appeals alleging two grounds for relief:

(1) that the evidence was insufficient; and

(2) that the sentence was excessive.

We affirm the judgment.

On December 11, 1992, the defendant, a black male, shot and killed a white male victim, Frank Anthony Boyd. Gladys Gulley, the victim's mother, testified that on the day of the murder, the victim had helped her move a china cabinet. Afterwards, the two went to a local bar to play pool. The victim, who had drunk some liquor while at his mother's house, had one beer at the bar. Later in the evening, he told her that he was going home and left driving a tan Mercury.

William Trotter, who had charges pending at the time of this trial for aggravated assault, possession of illegal weapons, theft, and drugs, had known the defendant for approximately two years. On the night of the murder, Trotter, who was carrying a .38 pistol, had borrowed a friend's car and had stopped by a Mapco gas station to ask the defendant to help return it. The defendant and his passenger, Anthony Crenshaw, agreed and followed in their car. After Trotter had returned the vehicle, the three men went to Dellway Villa Apartments, got out of their car, and began talking to a group of Trotter's friends. Trotter gave his gun to Crenshaw, who had a weapon of his own, and walked to his cousin's apartment to try to find some "weed". Unsuccessful, Trotter then returned to his friends.

At that point, the victim arrived in his car. While "Skinny Chris," one of Trotter's friends, tried to sell the victim drugs, the defendant approached the vehicle on the driver's side. The defendant began to argue with the victim and then snatched some of his money. The victim made racial slurs and said he intended to call the police. The defendant then threatened to "burn" the victim. At first, the victim backed his vehicle away from the defendant, but then returned, continuing to yell racial slurs. Eventually, the victim got out of the car, but reached back inside as if he might be getting a gun. According to Trotter, the crowd then scattered and the defendant, armed with a black .380 pistol, again threatened to "burn" the victim. Trotter claimed that he tried to intervene; the defendant ignored his pleas and fired several shots.

Trotter refused to allow the defendant take him home, but visited him later because he was concerned that he might be blamed for the murder. The defendant asked Trotter to "keep quiet" about the incident saying that no one had to know what had happened.

The police did go to Trotter's house and informed his mother that they believed her son had killed someone at the Dellway Villa Apartments. Meanwhile, officers arrested the defendant for drug possession and took him to the police department, where he was questioned about the murder.

Crenshaw, who had a prior felony record, is the defendant's brother-in-law. He lived with his sister and the defendant at the time of the murder. Crenshaw testified that the

defendant was armed with a .380 pistol and had a baggy containing crushed aspirin. He confirmed that the defendant had engaged in an argument with the victim and added that the crowd had encouraged the defendant to kill the victim before the shots were fired. Crenshaw claimed that he had also been unsuccessful in his attempt to discourage the defendant from firing his weapon.

Esther Johnson, the defendant's wife, confirmed that the defendant had armed himself with a gun on the night of the murder. She testified that when he returned to their residence, they left for his mother's house. The defendant was badly shaken and later admitted that he had shot a man.

Officer Scott Mitchell of the Metro–Nashville Police Department was the first to arrive at the scene. He found the victim's car, its engine still running, stopped in the middle of the road. The victim lay next to the passenger side of the car with a gunshot wound to the head. The victim was still alive, but his breathing was labored and his pulse was very weak. Officers were initially unable to find shell casings in the area.

Detective Alfred Gray, Detective Johnny Lawrence, and Officer Brad Corcoran, investigated the shooting. They found bullet marks on the victim's vehicle and blood on the street, but were unable to find any eyewitnesses to the shooting.

The following morning, Detective Gray returned to the scene to gather further evidence. He was shown shell casings which other officers had found in the apartment complex's parking lot. An unidentified occupant of the apartments also had found a casing. Detective Gray checked the victim's vehicle for weapons, but found none. Later that evening he interviewed Trotter and Crenshaw.

Dr. Mona Harlan, an Assistant with the Davidson County Medical Examiner's Office, performed the autopsy. Initially, she determined that the cause of the victim's death was a gunshot wound to the head. Because she found no exit wound on the victim's body, she looked for and found the fatal bullet.

Steven Scott of the TBI Forensic Crime Lab examined and compared the bullet removed from the body with the casings that Detective Gray had collected. The bullet was a .380, the same caliber as two of the shell casings found at Dellway Villa. Sandra Evans, also with the TBI, helped with the laboratory analysis. An expert in microanalysis, she conducted tests on a blue-green lacquer which had been found on two of the casings and the bullet removed from the body. Test results indicated that the paint on all three matched.

■ The defendant first asserts that the evidence presented at trial sufficiently supports a conviction for voluntary manslaughter, but not second degree murder. The trial court charged the jury on both offenses and the jury found the defendant guilty of second degree murder. After a thorough review of the record, we find that the evidence fully supports their verdict.

■ On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as triers of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); Tenn. R.App.P. 13(e).

Second degree murder is "[a] knowing killing of another." Tenn.Code Ann. § 39–13–210(a)(1). Voluntary manslaughter, a lesser included offense of second degree murder, is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn.Code Ann. § 39–13–211(a).

The defendant asserts that the evidence was insufficient for second degree murder

because the victim's death resulted from a mutual combat. In *Hunt v. State*, 202 Tenn. 227, 303 S.W.2d 740 (1957), our supreme court held that when a death occurs from a mutual combat, the proof supports only a conviction for voluntary manslaughter, not second degree murder. Mutual combat has been defined as "one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight." Black's Law Dictionary 266 (6th ed. 1990).

■■■ Mutual combat is not a statutory defense. *See generally* Tenn.Code Ann. §§ 39–11–203, –204, and –501 through –621. The underlying facts may qualify, however, as "adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn.Code Ann. § 39–13–211(a). Whether the acts constitute a "knowing killing" (second degree murder) or a killing due to "adequate provocation" (voluntary manslaughter) is a question for the jury. Had the jury here found that the killing had resulted from a quarrel in a mutual fight, and upon equal terms, voluntary manslaughter would have been the likely result. Obviously, the jury did not so find. The issue for our consideration is merely whether the evidence established all of the elements of second degree murder. Because there are facts in the record that the defendant intentionally shot and killed an unarmed man, that is adequate. That the jury chose to reject both the notion of provocation and the claim of self-defense was well within their prerogative.

■■ The defendant next challenges the imposition of the maximum sentence. The trial court applied four enhancement factors and one mitigating factor. The defendant argues that the sentence is too harsh due to the failure to apply two additional mitigating factors: (1) the defendant acted under strong provocation; and (2) the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. Tenn.Code Ann. § 40–35–113(2) and (11).

■■ When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, –103, and –210; *State v. Smith*, 735 S.W.2d 859, 862 (Tenn.Crim.App.1987).

The following four enhancement factors were applied by the trial court:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(2) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(3) The defendant had no hesitation about committing a crime when the risk to human life was high;[1] and

(4) The felony was committed while on probation from a prior felony.

Tenn.Code Ann. § 40–35–114(1), (9), (10), and (13)(C). The court also found that the defendant's youth affected his judgment and that he was entitled to some degree of mitigation for that reason. *See* Tenn.Code Ann. § 40–35–113(6).

---

1. This factor is inherent in every murder case because the taking of a human life is an element of the offense. However, these facts still support its application. The trial court applied the en-

hancement factor, not because the defendant endangered the victim, but rather because he endangered the lives of several bystanders by firing several shots.

The defendant argues that he acted under strong provocation. While mere words have traditionally been inadequate provocation to serve as a defense to a physical assault, racial slurs may qualify as the kind of provocation contemplated by Tenn. Code Ann. § 40–35–113(2). *See Whitlock v. State,* 187 Tenn. 522, 216 S.W.2d 22 (1948) (holding that mere words were insufficient provocation for even simple assault). In *Arnold v. Wiley,* 39 Tenn.App. 391, 284 S.W.2d 296 (1955), for example, the Court of Appeals held that provocative words could mitigate the amount of damages to be awarded to an assault victim. Here, however, the course of events did not take the defendant by surprise. He had armed himself in advance, apparently initiated the incident by taking the victim's money, and threatened to kill the victim several times before finally doing so. Under these circumstances, we think the trial court appropriately refused to apply this as a mitigating factor.

The defendant further asserts that he acted under such unusual circumstances that his conduct failed to demonstrate a protracted intent to violate the law. We disagree. From all appearances, the defendant had prepared to engage in dealing illegal drugs. There was evidence that he intended to defraud any potential buyer by packaging crushed aspirin. On probation for a drug conviction, the defendant knew that Dellway Villa was the place to deal drugs. He was armed. Sadly enough, these facts establish a sustained intent to violate the law. The defendant, therefore, was not entitled to any mitigation of his sentence based on this factor.

Because the trial court properly applied four enhancement factors and gave only slight weight to the single mitigating factor, a sentence in the upper range was permissible. We therefore defer to the presumption of correctness.

Accordingly, the judgment is affirmed.

WELLES, J., and WILLIAM S. RUSSELL, Special Judge, concur.