# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 23, 2000 Session

## STATE OF TENNESSEE v. DIMARKO BOJERE WILLIAMS

**Appeal from the Court of Criminal Appeals**
**Circuit Court for Maury County**
**No. 9190    Jim T. Hamilton, Judge**

---

### No. M1997-00113-SC-R11-CD - Filed February 20, 2001

---

Dimarko Bojere Williams was convicted of second degree murder and was sentenced to the Department of Correction for twenty-five years. Williams appealed, contending, *inter alia*, that the evidence was insufficient to support the conviction for second degree murder because he and the victim had been engaged in "mutual combat" at the time of the killing. In cases in which a victim is killed during mutual combat, he asserted, the defendant may be convicted of voluntary manslaughter only. The Court of Criminal Appeals affirmed the conviction for second degree murder but modified Williams's sentence on other grounds. We hold that the evidence is sufficient to support the conviction for second degree murder. In so doing, we reject the defendant's contention that a killing which occurs during mutual combat is, as a matter of law, voluntary manslaughter. The judgment of the Court of Criminal Appeals is, therefore, affirmed.

### Tenn. R. App. P. 11 Appeal by Permission from Appellate Court to Supreme Court; Judgment of the Court of Criminal Appeals Affirmed as Corrected

ADOLPHO A. BIRCH, JR., J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., FRANK F. DROWOTA, JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.

John E. Herbison, Nashville, Tennessee, for the appellant, Dimarko Bojere Williams.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Marvin S. Blair, Jr., Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Robert C. Sanders, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### I.  Facts and Procedural History

The defendant, Dimarko Bojere Williams, and the victim, Harold Shawn Woodard, had been antagonistic toward one another as far back as 1991 or 1992, when Williams began dating a woman with whom Woodard had previously been involved. On the morning of September 7, 1995, Williams was riding in a car driven by Travis Lawrie. Williams told Lawrie that Woodard had

recently broken out his (Williams's) car windows and that Williams would "have to do something about it." After riding around for three or four hours, Lawrie dropped Williams off at the home of a mutual friend.

Later the same day, as Lawrie was preparing to go to the store, he saw Williams riding in a car driven by James Marshall. The car stopped, and Lawrie told Williams where he was going. Lawrie continued on his route to the store, which took him past Woodard's house. As he approached Woodard's house, he noticed Marshall's car following behind him. He then saw Woodard at the edge of the street washing his mother's car. Lawrie stopped his car at a stop sign next to Woodard's house; Marshall's car stopped behind him.

In a statement given to police soon after his arrest, Williams said that Woodard shouted profanities at him as he passed the house. According to Williams, he got out of the car, tucked a revolver into the waistband of his shorts, and approached Woodard. As he approached, Woodard pulled a knife and advanced toward him while making "cutting" motions. Williams said that he then pulled the pistol from his waistband, and when Woodard grabbed his shirt and again menaced with the knife, he shot Woodard. Williams stated that Woodard had turned his body but had continued to grasp Williams's shirt, and he shot Woodard a second time. Williams said that as Woodard had attempted to flee, he may have shot him a third time.

In contrast, Lawrie testified that Williams had not armed himself with the pistol immediately upon getting out of the car; rather, he exited, walked toward Woodard, and began to argue with him. Lawrie stated that Williams had thrown a punch at Woodard, and Woodard had responded by pulling the knife. According to Lawrie's version of the incident, Williams then turned and walked back to the car, retrieved the pistol, held it down next to his leg, and returned to where Woodard was standing. Lawrie stated that when he saw the pistol, he drove away because he did not like being around guns. He did not see or hear any shots fired before driving away. A passer-by testified that he had heard the sound of a gunshot, and when he turned to look, he saw two men running near the street. One man was shooting the other in the back.

Police arriving on the scene found Woodard's body approximately forty to fifty yards from where the incident had started. A detective testified that Woodard had run across two yards; he said there was no blood trail in the first yard, but he did observe a blood trail in the second yard. According to the detective, this indicated that Woodard had been shot somewhere between his mother's car and the second yard. The detective also testified that an open, four-inch "lock-blade" pocket knife was found beneath Woodard's body. The medical examiner testified that Woodard's death was caused by multiple gunshot wounds.

The jury convicted Williams of second degree murder, and he appealed. He contended, *inter alia*, that because he had shot Woodard during mutual combat, he could be convicted of no greater offense than voluntary manslaughter and that the evidence, thusly, was insufficient to support the conviction for second degree murder. The Court of Criminal Appeals affirmed the conviction and, for reasons unrelated to this contention, reduced his sentence.

We granted review in order to examine the decision of the Court of Criminal Appeals in light of several pre-1989[1] opinions reversing second degree murder convictions in cases where the evidence showed that the parties had been engaged in mutual combat. From our reading of these pre-1989 cases, we find that death resulting from mutual combat did not compel a voluntary manslaughter conviction as a matter of law. Rather, the appellate courts held, generally, that one who kills another during mutual combat presumptively acts without malice and, instead, acts upon sudden heat or passion produced by provocation adequate to obscure the judgment of an ordinary man. Because the element of malice was eliminated in the 1989 revision of the criminal code, we conclude that the doctrine of mutual combat, to the extent it ever was recognized in Tennessee,[2] was abrogated by the revision. Under the voluntary manslaughter statute now in effect, proof that a death occurred during mutual combat may supply the evidentiary basis for a finding of "adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

It results that the doctrine of mutual combat will not compel, as a matter of law, the reduction of murder to voluntary manslaughter. Proof of mutual combat may, however, provide the evidence necessary for the fact-finder to convict the defendant of voluntary manslaughter rather than murder. Thus, despite the evidence of mutual combat presented in this case, we conclude that the facts support the jury's verdict of second degree murder. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

## II. Standard of Review

Our review in this case encompasses two different issues. First, we must decide whether the common-law doctrine of mutual combat remains viable with the advent of Tennessee's 1989 revision of the criminal code and whether, under that doctrine, a killing committed during mutual combat, as a matter of law, is voluntary manslaughter. Construction of statutes and application of the law to the facts are questions of law. See The Beare Company v. Tennessee Dept. of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993). We review questions of law de novo with no presumption as to the correctness of the lower court's conclusions of law. State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000); State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997).

Second, we must decide whether the evidence is sufficient to support Williams's conviction of second degree murder. We recently stated the applicable standard of review for this issue in State v. Hall:

---

[1]November 1, 1989, was the effective date of a comprehensive revision of Tennessee's criminal code. 1989 Tenn. Pub. Acts 591.

[2]As will be discussed below, it is unclear whether Tennessee courts ever held, as a matter of law, that proof of mutual combat would compel reduction of a second degree murder conviction to voluntary manslaughter. See infra section III. B. Thus, technically, it may be that mutual combat never truly bore the force of a common law doctrine under Tennessee law. Regardless, however, we conclude that, in the wake of the 1989 revision of the criminal code, proof of mutual combat serves as evidence of the provocation element of voluntary manslaughter but does not compel a voluntary manslaughter conviction as a matter of law.

When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. In determining the sufficiency of the evidence, this Court does not reweigh the evidence, or substitute its inferences for those drawn by the trier of fact. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. On appeal, the appellant bears the burden of proving that the evidence is insufficient to support the jury verdict.

8 S.W.3d 593, 599 (Tenn. 1999) (citations omitted).

## III. Analysis

The defendant asserts that the evidence is insufficient to support the conviction of second degree murder because, as a matter of law, a homicide resulting from mutual combat is voluntary manslaughter. See, e.g., Hunt v. State, 303 S.W.2d 740, 742 (Tenn. 1957). In response, the State argues that the facts of this case fail to establish mutual combat. In the alternative, the State asserts that the doctrine of mutual combat is no longer viable because: (1) it did not survive the 1989 revision of the criminal code; (2) it is incompatible with the current statutory definition of voluntary manslaughter; and (3) it is inconsistent with sound public policy.

### A. Doctrine of "Mutual Combat" Prior to Criminal Code Revision

Prior to November 1, 1989, the effective date of Tennessee's comprehensive revision of the criminal code, Tennessee law provided that an unlawful killing "with malice aforethought, either express or implied," constituted the offense of murder. Tenn. Code Ann. § 39-2-201 (1982) [repealed]. If the murder was "perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing" or was committed during the commission of a felony, the killing constituted first degree murder. Id. § 39-2-202(a) [repealed]. All other murders were deemed second degree murder. Id. § 39-2-211(a) [repealed]. Under the pre-1989 criminal code, manslaughter was defined as "the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act." Id. § 39-2-221 [repealed]. In addition, case law stated that voluntary manslaughter was "the unlawful and intentional killing by one of another, without malice, but upon a sudden heat or passion produced by provocation adequate to obscure the reason of an ordinary man, and thus negative malice." Smith v. State, 370 S.W.2d 543, 545 (Tenn. 1963).

In Wilson v. State, the Court of Criminal Appeals distinguished second degree murder from voluntary manslaughter. As the Court of Criminal Appeals stated:

The degree of homicide in the killing was for the jury to determine as shown by the facts. The essential element required to distinguish second (2nd) degree murder from voluntary manslaughter is the presence or absence of malice at the time of the killing. If the killing be not actuated by malice, then it is manslaughter.

574 S.W.2d 52, 55 (Tenn. Crim. App. 1978) (citations omitted).

The distinguishing element between second degree murder and voluntary manslaughter–the presence or absence of malice at the time of the killing–lies at the heart of the doctrine of mutual combat. In a number of cases decided before the revision of the criminal code, the appellate courts reduced convictions for second degree murder to voluntary manslaughter on the ground that the defendant and the victim had been engaged in mutual combat at the time of the killing. See Hunt, 303 S.W.2d at 742; see also Cooper v. State, 356 S.W.2d 405 (Tenn. 1962); Wright v. State, 497 S.W.2d 588 (Tenn. Crim. App. 1973); Mosley v. State, 477 S.W.2d 246 (Tenn. Crim. App. 1971). But see Gann v. State, 383 S.W.2d 32 (Tenn. 1964) (concluding that the evidence did not support a finding of mutual combat and therefore affirming the conviction for second degree murder).

It has been difficult, however, to determine whether the finding of mutual combat negated the element of malice as a matter of law, or whether mutual combat merely served as evidence of the "sudden heat or passion" element of manslaughter. Black's Law Dictionary's definition seems to support either interpretation. Under its description of mutual combat as "one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight,"[3] a finding of either a combat entered into willingly or a combat entered into "in hot blood" apparently would qualify. Likewise, in Hunt, mutual combat was not clearly defined. First, this Court seemed to treat mutual combat as evidence of provocation, stating, "Clearly the authorities support the proposition . . . [that] a killing ensuing from a sudden transportation of passion or heat of blood, as in a fight or sudden combat, is manslaughter." 303 S.W.2d at 742 (emphasis added). In the same paragraph, however, the Court quoted with approval language from Corpus Juris Secundum that "a homicide resulting from mutual combat or the excitement and heat of passion arising therefrom is voluntary manslaughter." 40 C.J.S. Homicide § 48(b) at 912, quoted in Hunt, 303 S.W.2d at 742 (emphasis added).

In Cooper, on the other hand, the Court reviewed the facts of the case and stated that "from a most careful reading of this record we cannot believe that the defendant intended to kill the deceased prior to being struck in the mouth [by the victim]" and that "[o]n the other hand, his act appears to have resulted from a sudden impulse or heat of passion." 356 S.W.2d at 410-11. The Court further noted the "general rule" that "'if a man kills another person, upon sudden heat produced by adequate provocation it is voluntary manslaughter.' There must be sudden heat from such provocation to negative malice" Id. at 411. Thus, the Court clearly applied the mutual combat doctrine as evidence of provocation rather than as a substitute for it. In light of that rule, the Court

---

[3]Blacks Law Dictionary 266 (6th ed. 1990).

stated, "[w]e are convinced from reading this record that the defendant is guilty of voluntary manslaughter and not murder in the second degree." Id.

Conversely, in Gann, the Court presented a thorough summary of the facts upon which the defendant based his claim that he was guilty, at most, of voluntary manslaughter. While acknowledging the mutual combat analysis of Hunt, however, the Court distinguished Hunt by concluding that there was sufficient evidence of malice in Gann to support the defendant's conviction for second degree murder. Gann, 383 S.W.2d at 37.

Our reading of the mutual combat cases leads us to conclude that the doctrine of mutual combat did not, as a matter of law, reduce second degree murder convictions to voluntary manslaughter. Instead, the doctrine was essentially a factual analysis used to determine whether the killing resulted from provocation sufficient to negate the existence of malice. The common thread in the cases in which the appellate court reduced the conviction from second degree murder to voluntary manslaughter is that the court, implicitly if not explicitly, concluded that evidence of the confrontation between the defendant and the victim sufficiently proved that the killing occurred as a result of provocation or the "heat of passion," thus negating the element of malice necessary to support a conviction for second degree murder.

### B. Criminal Code Revision and its Effect on the Doctrine of Mutual Combat

On November 1, 1989, Tennessee's revised criminal code went into effect. Enacted in 1989 Public Acts, Chapter 591, the revised code was a comprehensive modernization of the State's criminal law. In the new code, the statutory provisions relating to homicides were substantially revised. Under the revised code, second degree murder is now defined, in pertinent part, as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (1997). Likewise, voluntary manslaughter is now defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).

Because "malice aforethought" is no longer an element of second degree murder, it is now inaccurate to state that the element of malice is the essential distinction between second degree murder and manslaughter. Comparing the revised second degree murder and voluntary manslaughter statutes, the essential element that now distinguishes these two offenses (which are both "knowing" killings) is whether the killing was committed "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. It is in this context that we consider whether the doctrine of mutual combat remains viable and, if so, whether it applies to the facts of this case.

There are few published Tennessee cases discussing the doctrine of mutual combat after the effective date of the revised criminal code. In State v. Johnson, the defendant was convicted by the jury of second degree murder. 909 S.W.2d 461 (Tenn. Crim. App. 1995). He argued on appeal that the evidence was insufficient to support the conviction because he and the victim were allegedly engaged in mutual combat at the time of the killing. In addressing this argument, the Court of Criminal Appeals stated:

> Mutual combat is not a statutory defense. The underlying facts may qualify, however, as "adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Whether the acts constitute a "knowing killing" (second degree murder) or a killing due to "adequate provocation" (voluntary manslaughter) is a question for the jury.

Id. at 464 (citations omitted). The intermediate court went on to conclude that the evidence in that case supported the conviction of second degree murder. As the court stated, "[t]hat the jury chose to reject both the notion of provocation and the claim of self-defense was well within [its] prerogative." Id.

Similarly, in State v. Summerall, the jury found the defendant guilty of second degree murder. 926 S.W.2d 272 (Tenn. Crim. App. 1995). On appeal, the defendant argued, in pertinent part, that the trial court had erred in failing to instruct the jury on voluntary manslaughter because there was evidence that he had acted with passion produced by adequate provocation after the victim shot at him. The intermediate court agreed, reversed the conviction, and remanded the cause for a new trial. Although the Court of Criminal Appeals stated that the "far greater weight" of the evidence was otherwise, it concluded that there was evidence to provide "at least some support to the defense theory that [the victim] had either provoked the defendant or that the two men were involved in mutual combat." Id. at 278. Accordingly, the intermediate court held that the trial court committed reversible error in failing to charge the jury on voluntary manslaughter.[4]

We agree with the reasoning of the Court of Criminal Appeals in Johnson and Summerall. Although the statutory elements of second degree murder and voluntary manslaughter changed with the adoption of the revised criminal code in 1989, the current definition of voluntary manslaughter preserves the common law concept of "provocation." Even though the common law doctrine of mutual combat is directly related to the provocation element, we conclude that the revised code abrogated the mutual combat doctrine. The essence of the doctrine has been incorporated into the elements of the voluntary manslaughter statute. The facts and circumstances surrounding a killing occasioned by mutual combat may establish that the defendant was impassioned as a result of adequate provocation. Consequently, we hold that the trier of fact must consider all facts surrounding a killing, including the facts giving rise to an agreement to combat, to determine whether the killing resulted from "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

In so holding, it is not necessary that we consider the State's contention that the doctrine of mutual combat is inconsistent with sound public policy. The consequence of our holding is simply that the defendant may contend that the particular facts concerning the homicide, including proof

---

[4]In the pending case, the trial court instructed the jury on the indicted offense of first degree murder as well as the lesser-included offenses of second degree murder, voluntary manslaughter, and criminally negligent homicide. The trial court also instructed the jury on the defense of self-defense.

of mutual combat, warrant a finding that the killing was the result of "adequate provocation," thereby constituting voluntary manslaughter.

## C. Sufficiency of the Evidence

Williams argues that the evidence is insufficient to support his conviction of second degree murder because the proof shows that he and the victim were engaged in mutual combat at the time of the killing. Considering the evidence in the light most favorable to the prosecution, the evidence shows that Williams and Woodard had an acrimonious relationship and that earlier on the day of the killing Williams had made an implicit threat against Woodard. The evidence further shows that after making the implicit threat, Williams went to Woodard's neighborhood armed with a pistol. Arriving at the Woodard home, Williams got out of the car in which he was riding, tucked the pistol into his waistband, and walked toward Woodard, who was washing his mother's car. Williams initiated a physical confrontation with Woodard, who pulled out a knife, and Williams shot Woodard.

The jury heard the evidence and considered Williams's arguments that he shot Woodard in self-defense and, in the alternative, that he should be found guilty of voluntary manslaughter based upon a theory of mutual combat. By its verdict, the jury obviously rejected both arguments. As stated earlier, whether a knowing killing resulted from "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner" is a jury question. Johnson, 909 S.W.2d at 464; Wilson, 574 S.W.2d at 55. Based upon our careful review of the record, we hold that the evidence is sufficient to support the jury's verdict of guilt on the charge of second degree murder.

## D. Sentencing Issue

Williams further argues that in the event the Court affirms the second degree murder conviction, his sentence should be modified. He contends that the Court of Criminal Appeals failed to properly weigh the enhancing and mitigating factors. We find no error in the Court of Criminal Appeals's analysis of the sentencing issue, but we modify the court's judgment to correct an error.

The Court of Criminal Appeals modified Williams's sentence from twenty-five years imprisonment to twenty-two years. In its opinion, the court noted that the presumptive sentence was twenty years; the court then went on to state:

> [i]t is our opinion that the use of a firearm in the commission of this felony is serious enough to warrant a two year increase beyond the presumptive sentence. Appellant's sentence is therefore modified to twenty-two years incarceration in the Tennessee Department of Correction.

Despite the Court of Criminal Appeals's clear holding on the sentencing issue, an introductory paragraph of the intermediate court's opinion and the separate one-page Judgment filed by that court both state that the sentence is modified to "twenty years." The statements in the

introductory paragraph and the Judgment are clearly erroneous; Williams's sentence is twenty-two years in the Tennessee Department of Correction, as established by the Court of Criminal Appeals.

## IV. Conclusion

For the foregoing reasons, we hold that proof of mutual combat may be considered by the jury in determining whether a killing occurred as a result of "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." In this case, the jury heard evidence of Williams's and Woodard's conduct, which included proof of mutual combat, and it returned a conviction of second degree murder. We conclude that the jury considered the evidence and found that this killing did not occur as a result of "adequate provocation," and we hold that the evidence supports this verdict. Therefore, we affirm the decision of the Court of Criminal Appeals. Costs on this appeal are taxed to the defendant, Dimarko Bojere Williams.

_____
ADOLPHO A. BIRCH, JR., JUSTICE