IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2003 Session

## STATE OF TENNESSEE v. EVELYN HOLLY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-07503     Arthur T. Bennett, Judge**

**No. W2002-01200-CCA-R3-CD  - Filed August 27, 2003**

Defendant, Evelyn Holly was convicted of second degree murder following a jury trial.  Defendant now challenges her conviction arguing that the trial court erred in not suppressing her statement to the police.  Defendant also contends that the evidence is insufficient to sustain her conviction of second degree murder.  Specifically, Defendant argues that the evidence showed that she and the victim, Ronald Kyles, were engaged in mutual combat at the time of the killing and requests this court to reduce her conviction to voluntary manslaughter.  After a thorough review of the record, we affirm Defendant's conviction for second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and DAVID G. HAYES, J., joined.

Robert Wilson Jones, District Public Defender; Tony N. Brayton, Assistant Public Defender; Donna Armstard, Assistant Public Defender; and James Rayford, Assistant Public Defender, for the appellant, Evelyn Holly.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kevin Rardin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Defendant was indicted for one count of second degree murder.  Prior to trial, Defendant filed a motion to suppress the statement she gave the police immediately following the incident.  She alleged that she did not knowingly waive her right against self-incrimination and that her statement was made involuntarily.  The trial court denied Defendant's motion to suppress, and Defendant was subsequently convicted of second degree murder by a jury.  Following a sentencing hearing, the trial court sentenced Defendant to twenty years in the Tennessee Department of Correction.

## a. Background

According to Defendant's statement to the police, she and Mr. Kyles, the victim, had lived together for approximately ten months although she was still married to another individual. During their relationship, Defendant and Mr. Kyles had several altercations. One disagreement in 1998 resulted in both Defendant's and Mr. Kyles' arrest for aggravated assault, and a second confrontation in 1999 led to the couple's arrest for disorderly conduct.

On April 6, 2000, the couple first began arguing around noon when Defendant's husband telephoned her. Defendant and Mr. Kyles, however, "made up" and went to the grocery store to buy supplies for grilling outside that night. They made one more trip to the store that afternoon to buy beer. When they returned from this shopping trip, a young man arrived at the apartment and asked to see Defendant's son. Mr. Kyles thought the young man had come to visit Defendant, and this misunderstanding led to another argument which soon turned "physical." Mr. Kyles ran into the bathroom but left the door open a crack and told Defendant he was going to kill himself by taking some pills. Defendant tried to enter the bathroom, but Mr. Kyles held the door shut. Defendant then went into the bedroom and closed the door. For some reason, her son's girlfriend, Tina, brought Defendant a green-handled steak knife with a three-inch serrated blade. After the girl handed Defendant the knife, Mr. Kyles tried to get into the bedroom but Defendant leaned against the door and managed to prevent him from opening it. Defendant sat down on the bed and told Mr. Kyles she was going to leave him. About ten minutes later, Mr. Kyles came into the bedroom and began arguing with Defendant again. Defendant went into the bathroom, and Mr. Kyles followed. Defendant had her coat in her left hand and the knife in her right hand. Mr. Kyles grabbed the coat from Defendant to prevent her from leaving, then tried to wrestle the knife from her. Defendant jerked her hand loose, and the knife struck Mr. Kyles in his chest.

Defendant pressed a towel to the wound, but did not know how to perform CPR. She called out to her children to call an ambulance. Defendant continued to hold the towel to Mr. Kyles' chest until the emergency personnel arrived. After he was transported to the hospital, Mr. Kyles underwent surgery but died shortly thereafter.

Defendant said that during the incident her two sons and mother were in the living room and her daughter was in her bedroom. None of these persons, however, witnessed the killing. Defendant said she did not know Tina's last name or why Tina brought her a knife. While Defendant was in her bedroom, Tina stood by the kitchen door holding a brown-handled serrated knife in her hand. When asked what she thought Tina was going to do with the knife, Defendant replied that she guessed Tina was going to try and use it on Mr. Kyles. Defendant did not know what happened to the green-handled knife nor why a mop and bucket were in the bathroom. Defendant denied telling anyone to clean up the blood.

At trial, Michael Sinnock, a Memphis police officer, responded to the call about the incident at 10:45 p.m. When he arrived at the scene, one of the apartment's security guards and Defendant

were leaning over the victim, and the security guard was performing CPR. Mr. Kyles, however was unresponsive. A one or one and one-half inch cut was located on Mr. Kyles' upper chest area. Defendant told Officer Sinnock that Mr. Kyles had rushed into the apartment with the stab wound and collapsed in the bedroom. Officer Sinnock smelled a strong odor of bleach or other type of cleaning supply in the bedroom. Officer Sinnock left the apartment to flag down the ambulance and then transported Defendant to the police station. During the ride, Officer Sinnock said that he did not speak with Defendant and did not remember if she asked him to take her to the hospital.

In April 2000, Bryant Jennings worked for the Memphis Police Department's crime response unit. When he arrived at Defendant's apartment, Mr. Kyles had already been taken to the hospital. Officer Jennings found the back bedroom in disarray with bloody towels and sheets strewn about the room. A bucket was in the bathtub in the bathroom. After photographing the scene, Officer Jennings discovered a green-handled steak knife wrapped in a brown paper bag in the dumpster that serviced the apartment complex. Officer Jennings did not know whether the knife was tested for fingerprints or blood evidence.

Dr. O'Brian Smith, the Shelby County Medical Examiner, performed an autopsy on Mr. Kyles the morning after his death. Although Mr. Kyles had undergone surgery, the stab wound was still visible. Based on the results of the autopsy, Dr. Smith testified that the knife blade entered Mr. Kyles' body between his ribs, injured his left lung and then penetrated his heart. The depth of the penetration was four and one/third inches. Mr. Kyles also had fresh scratches on his forehead and temple with old scratches already in the process of healing on his hands. An examination of the rib cartilage showed that the knife used in the attack was serrated and that the blade was turned as it was withdrawn. Dr. Smith testified that the characteristics of the cutting edge of the steak knife found in the dumpster were reflected in the surface of Mr. Kyles' rib cartilage. Dr. Smith also testified that a three-inch knife blade could penetrate four or more inches as a result of the compaction of the soft body tissues caused by the insertion of the knife. Another possibility explaining why the depth of penetration exceeded the length of the blade was the fact that the heart deflates after the large vessels are no longer filled with blood. As a result, the heart's position at the time of an autopsy may be further from the chest than at the time of the stabbing.

Dr. Smith said that the wound was a stab wound, not an incised wound. An incised wound is caused by a slicing motion of the knife, and the wound is generally longer than it is deep. A stab wound, however, is made by driving the point of the blade straight into the body leaving a deep wound with only a small cut on the skin's surface. Based on the depth of the knife's penetration, Dr. Smith said that the user held the knife in a firm grip with a fixed wrist.

Sergeant Sharon Mabon with the Memphis Police Department's felony response unit interviewed Defendant following the incident. The interview began at approximately three o'clock in the morning and ended approximately two hours later. Sergeant Mabon explained Defendant's rights to her, and Defendant agreed to make a statement. At the conclusion of the interview, Defendant read over her statement, then initialed each page and signed at the bottom of the last page of the statement. The substance of the statement is summarized above. Sergeant Mabon said that

Defendant became physically ill before the interview began, and she brought Defendant some crackers and a soda.

On cross-examination, Sergeant Mabon said that she did not inquire into whether Defendant had trouble reading and writing. She did ask Defendant, however, whether she could read and write without glasses and Defendant responded affirmatively. Sergeant Mabon did not ask Defendant whether she had difficulties in school or whether she had been placed in special education classes. Defendant appeared alert and calm to Sergeant Mabon although she cried periodically during the interview.

Based on this evidence, the jury found Defendant guilty of second degree murder.

## b. The Suppression Hearing

Prior to trial, Defendant filed a motion to suppress the statement she made to the police during the early morning hours following the incident. Defendant argued that she did not knowingly and voluntarily waive her rights and that her confession was involuntarily made.

Sheila Lumpkin, a secretary with the Memphis Police Department, transcribed Defendant's statement. At the suppression hearing, Ms. Lumpkin testified that Defendant was first asked background questions such as her age and birth date, and then Sergeant Mabon read Defendant her *Miranda* rights. Defendant said that she wanted to make a statement. Defendant sat next to Ms. Lumpkin during the interview so that she could watch the computer screen as Ms. Lumpkin typed Defendant's answers. Ms. Lumpkin said that Defendant never asked to speak to a lawyer during the interview or indicated that she did not want to talk to the investigators about the incident. Defendant cried off and on during the whole interview. Before the questioning began, Defendant became ill and vomited. Ms. Lumpkin handed her the garbage can while Sergeant Mabon brought Defendant crackers and a soda. After Defendant rested a few minutes, the interview continued.

On cross-examination, Ms. Lumpkin said that Defendant was already in the room with the investigators when she arrived. Ms. Lumpkin said that Defendant asked for her medication before the interview began but no one responded to her request. At the end of the interview, Defendant told the investigators that she was on Prozac. Defendant was not asked whether she could read until the end of the interview and then only in the context of whether Defendant could read without the assistance of glasses. Defendant replied "yes" to the question.

Sergeant Mabon conducted the interview. She testified that Defendant was brought into the interview room by uniformed officers at approximately three o'clock in the morning. Sergeant Mabon informed Defendant that she was under arrest and charged with homicide because Mr. Kyles had died as a result of his injury. She explained that "homicide" meant a killing, and that Defendant could be sent to jail if she was found guilty of killing Mr. Kyles. Sergeant Mabon explained Defendant's rights to her, and Defendant said that she understood them and wanted to make a statement. Defendant appeared calm to Sergeant Mabon although she cried at times. When

Defendant became ill before the interview started, Sergeant Mabon asked Defendant if she needed an ambulance and Defendant replied negatively. Sergeant Mabon brought Defendant crackers and a soda. After Defendant sat for awhile, she felt better, and the questioning resumed. Once the interview was completed, Defendant's statement was printed out and handed to Defendant for her review. Defendant read the statement, then initialed each page and signed at the bottom of the statement. Sergeant Mabon said the interview lasted for approximately an hour and a half to an hour and forty-five minutes.

Patrick Fox, a detective with the Memphis Police Department, also participated in the interview and said that Defendant was advised of her rights before making her statement. Detective Fox said that Defendant never indicated that she did not want to give a statement and did not appear sleepy during the interview.

Defendant testified that she dropped out of school in the eighth grade. During her time at school, Defendant was placed in "resource" classes because she had trouble learning. Defendant said that she still could not read or write very well. Her school records indicate that Defendant has an I.Q. of between 74 and 76.

When the police officers transported her to the police station, she was not sure whether Mr. Kyles had died as a result of his injuries. Defendant said that the officer told her she had to give a statement and promised to take her to the hospital as soon as she finished. When she got to the interview room, one of the police officers asked her if she knew what was going on. Defendant said that she did not, and the officer showed her a piece of paper on which she read the words "first degree murder."

Before the interview began, Defendant told Sergeant Mabon that she did not want to give a statement because her "mind wasn't focused," but Sergeant Mabon told Defendant she had to answer their questions. Defendant told the investigators two more times that she did not want to answer questions. Defendant said that Sergeant Mabon read her the rights because Defendant did not know how to read them, but Defendant said Sergeant Mabon explained her rights after Defendant gave her statement, not before. Defendant said that she could not see the computer screen in front of Ms. Lumpkin. The only reason Defendant signed the statement was because she was tired and wanted the interview to end. Defendant said she cried throughout the interview and vomited three times. Defendant fell asleep at various times during the questioning, and the investigators woke her so that the interview could continue. Defendant did not hear Sergeant Mabon tell her she could have an attorney present when she made her statement. Defendant said that she did not ask anyone for her medication.

At the conclusion of the suppression hearing, the trial court examined the totality of circumstances surrounding Defendant's custodial interview and determined that Defendant knowingly waived her right against self-incrimination and that Defendant's statement was voluntarily and freely given. The trial court accredited the testimony of Sergeant Mabon, Detective Fox and Ms. Lumpkin regarding the circumstances of the interview. Specifically, the trial court

accredited the testimony of the investigators that Defendant's rights had been read to her before the questioning commenced, and that Defendant voluntarily waived those rights. The trial court found no evidence indicating that Defendant had been pressured or coerced into giving her statement.

In her appeal, Defendant argues that the trial court erred in not suppressing her statement. Under the totality of the circumstances, Defendant contends that she did not knowingly or voluntarily waive her right against self-incrimination. Defendant also argues that her low level of education and mental capabilities, lack of sleep and the police officer's promise to take her to the hospital to see Mr. Kyles if she gave a statement overwhelmed her will to resist and rendered her statement involuntary.

A defendant's statements made during custodial police interrogation are inadmissible "unless the state establishes that the defendant was advised of certain constitutional rights and waived those rights." *State v. Bush*, 942 S.W.2d 489, 499 (Tenn. 1997), *cert. denied*, 522 U.S. 953, 118 S. Ct. 371, 139 L. Ed. 2d 293 (1997). At a minimum, the police must inform the accused that he or she has the right to remain silent, that any statement may be used in evidence against the accused, and that the accused has the right to have an attorney, either retained or appointed, present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). In order to determine whether the defendant's waiver of such rights is voluntary, intelligent and knowing, we must look to the totality of the circumstances. *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992); *State v. Rosa*, 996 S.W.2d 833, 838 (Tenn. Crim. App. 1999). The totality of the circumstances must reveal an uncoerced choice and the required level of comprehension. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)). When an accused contends that his or her waiver of *Miranda* rights was not voluntarily or understandingly made, the court must consider such factors as the defendant's age, level of functioning, prior criminal justice experience, demeanor, responsiveness to questioning, possible malingering, and the manner in which the *Miranda* rights were explained. *Blackstock*, 19 S.W.3d at 208. No single factor, however, is necessarily determinative. *Id*.

Even if an accused knowingly waives his right against self-incrimination, however, a confession must still be voluntary to be admissible. *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (citing *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). "In order to be considered voluntary, the statement must not be extracted by 'any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id*. (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 568 (1897)). In order to make this determination, the particular circumstances surrounding each confession or statement must be examined. *Monts v. State*, 218 Tenn. 31, 400 S.W.2d 722, 733 (1966). The crucial question is whether the behavior of the State's officials was "such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L. Ed. 2d 760 (1961)).

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court is a question of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

Defendant maintains that her low level of education and mental capabilities precluded her ability to knowingly and voluntarily waive her rights. The record reflects that Defendant has an IQ of between 74 and 76 and dropped out of school in the eighth grade. Although Defendant failed all her classes during her last year at school, she previously maintained mostly C's and Ds. While in elementary school, Defendant was reading at or below her grade level.

In *Blackstock*, the Tennessee Supreme Court recognized that "mentally retarded [or mentally impaired] individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver." *Blackstock*, 19 S.W.3d at 208. A defendant's mental impairment, however, is simply one factor that must be considered along with the totality of the circumstances. *Id.* In *Blackstock*, the defendant had an IQ of 55 with a level of functioning equivalent to a child between six and nine years of age. The defendant could neither read nor write, and a legally appointed conservator handled the defendant's affairs. Based on a review of the record, the court concluded that the evidence did not support a finding that the defendant had any meaningful appreciation of his constitutional rights. *Id*. at 207-08.

The record in this case, however, does not indicate that Defendant was comparably impaired. Defendant was thirty-five years old in April 2000. Although apparently unemployed at the time of the incident, Defendant had previously held a job for nearly seven years as a cook, and there is no indication in the record that she was incapable of managing her own affairs or raising her nine children. Defendant responded intelligently and coherently to the questions posed by the investigators and was able to provide a detailed description of the sequence of events leading to Mr. Kyles' death. In addition, Defendant was familiar with the arrest process since she had previously been arrested on four different occasions for disorderly conduct, aggravated assault, and two charges of driving with a revoked license. Defendant agreed that Sergeant Mabon read her rights to her, and the trial court accredited Sergeant Mabon's testimony that Defendant understood those rights. The evidence does not preponderate against the trial court's finding that Defendant knowingly waived her right against self-incrimination.

Defendant also argues that the totality of the circumstances under which her statement was extracted overwhelmed her will to resist making the statement. Specifically, Defendant points to her lack of sleep, her emotional and physical state during the interview, and her reliance on the police officer's promise that she could see her fiancee if she gave a statement.

Defendant said that the police officer who transported her to the police station following the incident promised to take her to the hospital to see Mr. Kyles once she had given her statement to the investigators. At that time, Defendant believed Mr. Kyles was still alive. Once Defendant met with the investigators, however, Sergeant Mabon informed her that Mr. Kyles had died. During the interview, Defendant never expressed any desire to see Mr. Kyles' body, and the subject was not raised again.

Defendant testified that she was so sleepy during the interview that she fell asleep during questioning. She claimed that one of the investigators woke her up and made her continue with the interview. Defendant also said that she was crying continuously and vomited three times during the interview. Detective Fox, on the other hand, testified that Defendant did not fall asleep during the interview. Both Sergeant Mabon and Ms. Lumpkin said that Defendant was physically sick once before the interview began. Sergeant Mabon brought Defendant some crackers and a soda to settle her stomach and asked Defendant if she wanted an ambulance. Defendant replied negatively, then sat quietly for awhile until she felt better. At that point, Defendant said that she wanted to make a statement. Defendant said that she was taking Prozac at the time of the incident but denied asking anyone for her medication. Defendant also denied telling the investigators that she was ill because she drank alcohol while she was taking her medication.

Whether Defendant's confession was the product of police coercion or improper promises rests upon an assessment of the witnesses' credibility. The trial court accredited the testimony of Sergeant Mabon, Ms. Lumpkin and Detective Fox concerning the circumstances surrounding the taking of Defendant's statement. The evidence does not preponderate against the trial court's findings that Defendant was not coerced by the police into giving her statement. Defendant is not entitled to relief on this issue.

Accordingly, under the totality of the circumstances, we hold that Defendant knowingly and voluntarily waived her constitutional right against self-incrimination and voluntarily gave her statement concerning the killing of Mr. Kyles. The trial court did not err by denying the motion to suppress evidence.

## c. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to sustain her conviction for second degree murder. Specifically, Defendant argues that the evidence showed that she and Mr. Kyles were engaged in mutual combat at the time of the killing and therefore her conviction should be reduced to voluntary manslaughter.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210. For second degree murder, "a person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); *State v. Page,* 81 S.W.3d 781, 788 (Tenn. Crim. App. 2000).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. Although both offenses are "knowing" killings, the essential element that distinguishes voluntary manslaughter from second degree murder is the presence of adequate provocation. *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001).

Prior to the adoption of the revised criminal code in 1989, the common law doctrine of mutual combat was used in a number of cases to reduce a conviction of second degree murder to voluntary manslaughter "on the ground that the defendant and the victim had been engaged in mutual combat at the time of the killing." *Id.* at 537 (citations omitted). With the enactment of the 1989 revised criminal code, however, the doctrine of mutual combat was abrogated. *Id.* Instead, "[t]he essence of the doctrine has been incorporated into the elements of the voluntary manslaughter statute." *Id.* In other words, the defendant "may contend that the particular facts concerning the homicide, including proof of mutual combat, warrant a finding that the killing was the result of 'adequate provocation,' thereby constituting voluntary manslaughter." *Id.*

Considering the evidence in the light most favorable to the State, the evidence shows that Defendant and Mr. Kyles experienced several altercations during the course of their relationship. On the evening in question, the couple fought periodically during the day. Before the stabbing, Defendant stopped fighting and sat down on her bed saying that she was going to leave Mr. Kyles. Mr. Kyles pursued the argument and attempted to grab Defendant's coat to prevent her from leaving. In their struggle, Defendant stabbed Mr. Kyles in the chest. Defendant testified that she "jerked aloose [sic] and swung. That's when (the knife) hit him in the chest." Dr. Smith, however, testified

that the wound was a stab wound, not an incised wound which is more characteristic of a random slice with a knife. In order to achieve the depth of wound that Defendant did with the size knife she used, Dr. Smith said that Defendant must have held the knife in a firm grip with a fixed wrist. The green-handled knife was later found wrapped in a brown paper bag and buried in a dumpster in the apartment's parking lot. Defendant also gave a totally inconsistent explanation to the first police officer who arrived at the scene. She stated that the victim had rushed into the apartment already stabbed and had collapsed in the bedroom.

The jury was instructed on the elements of second degree murder and the elements of the lesser-included offenses of voluntary manslaughter, reckless homicide and criminally negligent homicide. After hearing the evidence and the arguments of counsel, the jury, by its verdict, obviously rejected Defendant's argument that she stabbed Mr. Kyles in an act of passion resulting from adequate provocation. "[W]hether a knowing killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner'" is a question for the jury. *Williams*, 38 S.W.3d at 539 (citing *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)); *Wilson v. State*, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978). Based upon a thorough review of the record, we conclude that a rational trier of fact could have found the elements of second degree murder beyond a reasonable doubt. The evidence is sufficient to sustain Defendant's conviction for second degree murder.

### Conclusion

After a thorough review of the record, we affirm the judgment of the trial court.

_____

THOMAS T. WOODALL, JUDGE