IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2002

## STATE OF TENNESSEE v. PERCY M. CUMMINGS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-07070      John P. Colton, Jr., Judge**

_____

**No. W2001-01721-CCA-R3-CD - Filed March 21, 2002**

_____

The Appellant, Percy M. Cummings, was convicted by a Shelby County jury of second degree murder and was sentenced to twenty-four years in the Department of Correction. On appeal, Cummings contends that the evidence presented at trial was insufficient to support the jury's verdict. After review, we find no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

C. Michael Robbins and William D. Massey, Memphis, Tennessee, for the Appellant, Percy M. Cummings.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas Hoover, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

The victim, Elizabeth Wright, was last seen by her son, Simon Gordon, on December 15, 1997. On December 23, 1997, Gordon received a telephone call from his aunt who stated that no one in the family had seen or heard from the victim in the past few days. On Christmas Eve, Gordon went to his mother's residence on North Evergreen and found mail scattered along the porch. Although the victim's vehicle, an Isuzu Rodeo, was missing from the driveway, Gordon was able to see the victim's purse in the bedroom when he peered through a window. Gordon immediately telephoned police who searched the residence and were unable to locate the victim.

On December 30, 1997, the body of the victim was discovered in an alley about two blocks from a residence on North Parkway that the victim rented to the Appellant and his wife. The victim was wrapped in garbage bags and a blanket. Dr. O.C. Smith performed an autopsy on the victim and found the cause of death to be a near gunshot wound to the left side of the victim's head. Dr. Smith opined that the projectile recovered from the victim's skull was fired from a .25 caliber weapon. The victim also sustained a stab wound to the neck and blunt trauma to the face during life, findings consistent with her hitting a "complicated surface."

While Sergeant Robert Shemwell was investigating the victim's death, he received a telephone call from a resident on North Parkway who stated that he found it unusual that the victim's body was discovered near the victim's rental property. Sergeant Shemwell also learned that officers had found the victim's stripped vehicle parked in the driveway of an abandoned house. Witnesses told law enforcement officers that a man in a white sports car had stopped by and inquired about the vehicle. Because the description matched that of the Appellant's vehicle, Sergeant Shemwell decided to interview the Appellant and his wife at their residence. During this interview, Sergeant Shemwell noticed blood stains at the residence, garbage bags matching those the victim was wrapped in, and a type of weed that was found on the victim's body but that did not grow in the location where she was found.

On January 5, 1998, the Appellant waived his fifth amendment rights and gave a statement wherein he admitted to killing the victim. According to the Appellant, the victim came to his residence and asked him to begin paying his rent before the agreed due date. The Appellant told police that a heated argument ensued, that the victim "reached out to grab me," and that he shot her twice in the head with a .25 caliber weapon in the storage room.

Because the Appellant's account of what took place did not match physical evidence found at the crime scene, the Appellant was asked to give a second statement. After waiving his rights and admitting that "there [were] some things [he] left out" of his first statement, the Appellant gave the following statement on January 6, 1998:

On the 16th of December, 1997, I had arrived home at about 3:45 PM and I took about an hours nap and I was awoke by some noise outside of the house. Once I got outside I seen Ms. Wright out by the flowers and I had asked her about the hot water heater and how to light it.

Me and Ms. Wright had walked to the storage room and we went down into the basement below the storage room where the water tank is. After she had showed me how to light the pilot light she had started talkin about the rent and she wanted to start collecting the rent early because she was sayin she was behind on paying her second mortgage she had taken out on the house. I told her by the lease agreement she had with me and my wife that we were suppose to pay it on the 1st and the 15th of the month. She asked if we could start paying the rent a little earlier and I told her

we couldn't go by word of mouth, that she would have to write another contract, an agreement about paying on certain dates she wanted it on.

At first she got upset about it and about how far in debt she is and so I had told her that the only thing I could do was to pay her what we had already agreed on, on the 1st and the 15th.

About this time we started walking up the stairs into the storage room and Ms. Wright was gettin loud and frustrated with me. I was standin up top in the storage room and she was slightly behind me comin up the stairs and she had went on to sayin that she couldn't take it any more about her bein behind on her bills and I explained to her that we were behind on ours too but we always paid the rent on time and by this time I was gettin upset and I had told her that there was nuthin we could do about her bein behind on her bills and she said that I could terminate the lease at any time and that's when I was really frustrated and mad myself and I went to slam the door to the basement.

Ms. Wright was standin between the door and the table in the storage room and when I slammed the door it struck her on the left side of her face and when the door hit her she was fallin back and yelled "oh my God" and fell back onto the floor and that's when I seen her bleedin a little bit from the left side of her face. Ms. Wright started breathin real slow and that's when she said, "I don't think I'm gonna make it," so I had panicked and went inside the house and went upstairs and got the gun out of my bedroom drawer and came back down stairs and went outside toward the shed and I looked around to see if anybody was outside and there wasn't nobody outside so I went into the shed and she was still breathin real slow and I propped her up from behind and that's when I positioned myself to the right side of her and that's when I pointed the gun to the back side of her head and I had shot one time and after the first shot she fell back down and I didn't see her breathin anymore and I went to the shed door and looked out real quick and I didn't see anybody so then I shut the door to the storage room and that's when I shot her again on the left side of the temple as she was lyin on the floor.

After that I went outside the shed room and closed and locked the door and went over to the flower garden where I first saw Ms. Wright to see if her purse was there. I didn't see the purse so I went back to the shed and I searched her pockets and got the keys to her truck.
. . .

The next mornin at about 4:45 AM, I then unlocked the shed door and turned on the shed light and I went back inside the house and got two Hefty garbage bags from the pantry in the kitchen and I took the garbage bags and went back inside the shed and covered her body. I put one over her head and slid it down over the top part of her

body and the other bag I pulled up over her feet and legs. I pulled her out of the way a little bit and I went back to the house and got some water and bleach and came back to the shed and cleaned up some of the blood. After I cleaned up the blood I went to the trunk of my car the '62 Buick and I spread the white and pink blanket open and I went back into the shed and drug her body by her feet and ankles to the back end of the car where the trunk was open and I put her feet in the trunk first and then I lifted her up by her arms and put the rest of her in the trunk. Then I wrapped the blanket around the plastic bags and Ms. Wright's body . . .

. . .

I had woke up on the 30th of December about 4:30 that mornin and went outside to warm up the car and had got ready for work and I drove down the alley behind my house going west on the alley and turned left going south down the alley behind the houses on Stonewall. I drove down the alley and stopped between Galloway and Overton Park and I had got out of the car and opened the trunk and I grabbed her by her feet and ankles first and lifted the first half of her out and grabbed her by her arms and lifted the rest of her body out of the trunk and I laid her down face up in the alley.

A search of the Appellant's residence revealed the presence of Ms. Wright's blood on the stairway leading to the water heater, one spent bullet in the storage room, and the .25 caliber gun used in the murder which was found in a closet.

Although the Appellant was indicted and charged with first degree murder, the jury found him guilty on the lesser offense of second degree murder.

## SUFFICIENCY OF THE EVIDENCE

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert denied,* 507 U.S. 954, 113 S. Ct. 1368 (1993).

The Appellant argues that the evidence presented at trial is insufficient to support his conviction for second degree murder as the evidence at best supports no greater offense than voluntary manslaughter. In this regard, we note in *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001), our supreme court observed that in comparing the "second degree murder and voluntary manslaughter statutes, the essential element that now distinguishes these two offenses (which are both 'knowing' killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" In this case, the Appellant's sufficiency argument is premised upon the assertion that because "the prosecution failed to negate the facts in evidence which establish that the killing was accomplished by the [Appellant] while in a state of passion aroused by adequate provocation which led him to act in an irrational manner," his conviction for second degree murder cannot stand. In support of this argument, the Appellant cites as authority Tennessee Code Annotated § 39-11-201(a)(3) for the proposition that the "prosecution bears the burden of negating, beyond a reasonable doubt, the evidence which raises the issue of the lesser offense of voluntary manslaughter as a defense to murder in the second degree." We find this legal argument misplaced. The provisions of Tennessee Code Annotated § 39-11-201(a)(3) refer to "[t]he negation of any <u>defense</u> to an offense defined" in Title Thirty-Nine. Clearly manslaughter is not an enumerated statutory defense to an offense under our criminal code but, rather, a degree of homicide codified in Tennessee Code Annotated § 39-13-211(a). *See also Tyrone V. Turner v. State*, M2000-01949-CCA-R3-PC, (Tenn. Crim. App. at Nashville, Mar. 29, 2001), *perm. to appeal denied*, (Tenn., Sept. 10, 2001).

Second, the Appellant contends that the proof at trial was unrefuted as to the existence of an argument between he and the victim. He maintains that any homicide conviction other than manslaughter is improper because the killing was committed in a state of passion produced by adequate provocation. We disagree. The jury is not obligated to accept only the Appellant's testimony for the motive of the killing, even if unrefuted. Whether the killing of one person by another occurs under circumstances which justifies a verdict of second degree murder or voluntary manslaughter is a question of fact to be determined by the jury under proper instructions and from a consideration of all the evidence.

The evidence shows that as the Appellant and victim were walking back up the stairway from the basement, the Appellant threw the trap door down puncturing the victim's neck. The victim fell down the stairs and told the Appellant that "she didn't think she was going to make it." The Appellant drug her up the stairs and into the storage room. He left the storage room, proceeded into his house, went upstairs, retrieved his gun from a drawer, went downstairs, then went outside, checked to see if anyone was around, and then went back into the storage room. The Appellant propped the victim up before he fired one shot into her head at close range. The victim's body remained in the trunk of the Appellant's vehicle for two weeks until the Appellant finally discarded it in an alley near his home.

We disagree with the Appellant's contention that the evidence was insufficient to support a conviction for second degree murder. The jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. By convicting him of second degree murder, the jury obviously

rejected the Appellant's assertion that the victim was killed while the Appellant was in a state of passion produced by adequate provocation. Such decisions are within the exclusive province of the jury and will not be disturbed by this court upon appeal, as we are required to presume that the jury has drawn all reasonable inferences from the evidence in favor of the State. Moreover, a rational trier of fact could have reasonably concluded that the Appellant knowingly killed the victim. After incapacitating the victim, the Appellant left the area, retrieved his pistol from upstairs, returned, and shot the victim in the head. Clearly these facts establish that the Appellant was aware of the nature of his conduct and that his conduct was reasonably certain to cause death. Tenn. Code Ann. § 39-11-302(b). This issue is without merit.

Third, the Appellant argues that Sergeant Shemwell made improper comments during his testimony that rise to the level of plain error and, thus, require reversal of his conviction. During cross-examination by defense counsel, Sergeant Shemwell testified, without objection, that he did not believe certain portions of the Appellant's statements to the police were truthful. Plain error is defined as error which has affected the substantial rights of an accused. Tenn. R. Crim. P. 52(b). In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court concluded that the "'plain error' must [be] of such great magnitude that it probably changed the outcome of the trial." (citing *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). We find the Appellant's "plain error" argument ill-taken. Indeed, we find that no error resulted from Shemwell's testimony. At the time the alleged error occurred, defense counsel was questioning Shemwell as to why he decided to charge the Appellant with first degree murder rather than manslaughter and why he took a second statement. Sergeant Shemwell answered counsel's questions by explaining that the Appellant's first version of the facts surrounding the murder did not match the scientific evidence found at the scene, *i.e.* the victim sustained only one gun shot wound and also sustained blunt force trauma to the head. Thus, Sergeant Shemwell believed that the Appellant was not being completely truthful with him in his first statement to police and decided to again question the Appellant about the events surrounding the murder. Sergeant Shemwell did not advance an alternative theory of what he believed took place that day. Instead, Sergeant Shemwell merely provided his opinion that he personally believed the Appellant was not being truthful with law enforcement officers about what took place since the Appellant's version of the facts conflicted with physical evidence found at the scene.

Rule 701 of the Tennessee Rules of Evidence states that a lay witness who is providing testimony in the form of an opinion or an inference is limited to those opinions or inferences which are: (1) rationally based on the perception of the witness; and (2) helpful to clear understanding of the witnesses's own testimony or the determination of a fact in issue. We conclude that the testimony of Sergeant Shemwell was permissible under Rule 701. Sergeant Shemwell testified that he believed the Appellant was being untruthful because his statements did not reconcile with the forensic evidence. Accordingly, we find this issue to be without merit.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the Shelby County Criminal Court.

_____
DAVID G. HAYES, JUDGE