IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2001 Session

## STATE OF TENNESSEE v. KENDRICK JERMAINE MERRITT

**Appeal from the Criminal Court for Davidson County**
**No. 99-C-2215    J. Randall Wyatt, Judge**

**No. M2000-02363-CCA-R3-CD - Filed March 27, 2002**

Kendrick Jermaine Merritt appeals from his Davidson County conviction of second degree murder for the killing of Julia Lynn Baskette. He claims on appeal that the evidence at trial supports a guilty verdict of no offense greater than voluntary manslaughter and that the trial court excessively sentenced him to a maximum, 25-year term of incarceration. Because we disagree in both respects, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the Appellant, Kendrick Jermaine Merritt.

Paul G. Summers, Attorney General & Reporter; Christine M. Lapps, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Brox, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

This case arises from the homicide of Julia Lynn Baskette, also known as Julia Matlock. At the time of the crime, the defendant worked as a truck driver. His occupation brought him to Nashville, where he encountered the victim under circumstances that are not entirely resolved by the evidence. The victim was struggling with drug addiction and was working as a prostitute.

According to the state's theory, the defendant and the victim were alone in the defendant's truck when the defendant shot the victim without justification. The defendant claimed at trial that the victim attacked him; they struggled, and the victim was shot when a weapon over which they were struggling accidentally fired. Thus, the factual issues in this case required, in large part, an assessment of the persuasiveness of the state's circumstantial proof against the credibility of the defendant's testimony.

The state's evidence at trial demonstrated that on the afternoon of July 8, 1999, the manager of a convenience store in the area of what would later become the crime scene saw the defendant and the victim together in her store purchasing items. She was certain that the two of them entered and departed the store together.

Later that evening, emergency officials were called to an address on Dickerson Road in Nashville. There, they discovered a badly injured woman lying on the ground. The woman, later identified as the victim, was nude and lying face up in the grass about ten feet from the right side of the cab of a tractor-trailer truck. Paramedics discovered that she had a pulse and loaded her onto a stretcher. However, by the time they were able to load her into their ambulance, the woman's pulse had stopped. A heart monitor failed to reveal any electrical activity of the heart. Due to a large, apparent gunshot wound to the head and the lack of vital signs, they determined that the victim had suffered a "devastating injury" and ceased efforts to revive her.

Numerous police officers responded to the scene. They generally described seeing a tractor-trailer truck parked in a dark parking area behind a business. There was another trailer nearby, and a red pickup truck was parked near the tractor-trailer truck. A large crime scene area was secured, and some civilians who were on the scene when the police arrived were secured outside the crime scene perimeter.

As these events were transpiring, Officer John Grubbs encountered the defendant at a convenience store nearby. The defendant was shirtless, and his shorts, socks and shoes had blood on them. The defendant came running up to Officer Grubbs and said that a girl had been shot in his truck. Officer Grubbs then learned from his police radio of the discovery of the victim. Officer Grubbs obtained the keys to the defendant's truck from the defendant, and he later transported the defendant to the crime scene. While the defendant was in Officer Grubbs's police car, he told Grubbs that he had stopped at a store to get a drink, and after he returned to his truck, a man armed with a gun came out of the sleeper compartment of the truck and demanded money. A woman then appeared from the sleeper compartment, and the male robber demanded that she give him all the money she had earned that evening. The woman refused, and the male robber shot her. He attempted to shoot the defendant, but the gun would not fire. The robber told the defendant he would be blamed for the victim's shooting, and he fled the truck, dropping the gun. The defendant picked up the gun and attempted to fire it, but it would not fire.

The defendant was later questioned and gave three different versions of events culminating in the victim being shot. First, he claimed that an unidentified man and the victim hid in his truck and emerged after he returned from a convenience store. The man attempted to rob the defendant, and the man then shot the victim with the defendant's gun, around which he wrapped the defendant's shirt, when she refused to give him the money she had earned that evening. The man then forced the defendant to undress the victim and move her body. The man told the defendant that the defendant would be blamed for the shooting, told the defendant to move the victim's body, and threw the defendant's gun at him. The man then left. The defendant's second version of events was that a man and the victim were in his truck when he returned to it from shopping in a convenience

store. The man forced the defendant to drive, and he and the victim took turns holding the defendant at gunpoint. During a struggle for the gun, the victim was accidentally shot. The third account the defendant gave was that the unknown man and the victim held the defendant at gunpoint. The man forced the defendant, at gunpoint, to submit to fellatio performed by the nude victim while the man smoked crack cocaine. While holding a wooden club, the man handed the gun to the defendant and demanded that the defendant shoot the victim. The man helped the defendant fire the gun at the victim. The defendant was not the one who removed the victim from the truck.

Approximately four days after the victim's death, a purse was discovered on top of a trailer that had been parked near the defendant's tractor-trailer on the date of the homicide. The purse was identified as belonging to the victim. It was determined that the location on the trailer where the purse was found was adjacent to where the cab of the defendant's truck had been parked on July 8.

An autopsy was performed on the victim's body. The victim had been shot in the left side of the face at close range. Although she may have lived briefly after being shot, any such period would have been extremely short absent medical care. The victim had abrasions, contusions and lacerations on various parts of her body, as well as a fractured finger. Some of the injuries were consistent with the victim having been dragged across the floor of the truck, out the door, across the steps and across the gravel parking lot. Other injuries were consistent with blows from a wooden stick recovered from the truck. Hand injuries were consistent with defensive wounds. DNA evidence collected from the victim's vaginal and anal areas was consistent with the defendant's DNA profile.

Police identification personnel recovered evidence from the scene and the defendant's truck. A handgun, which the defendant admitted owning, was recovered near a pay telephone in the parking lot. Subsequent scientific evaluation revealed this to be the weapon with which the victim was shot. There was a significant amount of blood throughout the truck's interior, and there was blood on the metal step on the exterior passenger side of the cab. Some of the blood had small wood chips in it, and a damaged, bloody wooden club used for checking for flat tires was recovered. A tooth fragment later matched to a second fragment found in the victim's hair was discovered. Women's clothing, a broken piece of fingernail, and live .380 ammunition was also found in the truck cab. Blood spatter was observed in the sleeper portion of the cab, as was blood transfer on the curtain separating the front of the cab from the sleeper compartment.

The defendant took the stand to rebut the state's proof. He testified he met the victim at a convenience store, and she asked him for a ride to another store nearby. Because he needed directions to the interstate, he allowed her to accompany him in his truck and told her he would pay her five dollars for her assistance in finding the interstate. He claimed that once inside the truck, the victim climbed into the sleeper compartment of the truck, rummaged through some of the defendant's property, and disrobed. The defendant told her that he did not "mess around" and demanded that she get out of the truck. The two began struggling. The defendant claimed that the victim began assaulting him with a handled squeegee he had in the truck for cleaning windows, and

he defended himself by hitting her about the legs with a wooden tire knocker. The defendant testified that as the two struggled, a handgun that he had stored in the truck underneath a rag was uncovered, and the victim grabbed it. He claimed that he grabbed the barrel of the gun and attempted to wrest it from the victim's grasp. However, the gun discharged, striking the victim. The defendant panicked. He dragged the nude victim out of the truck. Although he had experience as a certified nursing assistant, he did not attempt to aid the victim. He claimed that he had heard someone outside the truck as he was struggling with the victim, and he was afraid this person would harm him, so he took the gun with him when he left the truck. However, he dropped the gun near a pay telephone. He went into the road and attempted to flag down a passing car. He asked the occupants of a red pickup truck and a gray Buick to call the authorities. He was eventually able to stop a taxi, which he had take him to a convenience store. At this store, the defendant approached a police officer for assistance.

The defendant denied that he had been at a convenience store with the victim earlier in the day. He also denied having had sexual relations with the victim. He said that he could not explain why his sperm was inside her body and hypothesized that he might have had a "wet dream" earlier in the day. He denied having placed the victim's purse on top of a trailer. He acknowledged his untruthfulness in the statements he had given shortly after the homicide.

The defendant's mother testified about the defendant's good character and work ethic, as did the defendant's wife and a family friend.

To rebut the defendant's evidence, the state recalled a detective who testified that the defendant had not reported any injuries to him, contrary to the defendant's testimony that he had reported injuries from the struggle with the victim to the detective.

The jury acquitted the defendant on the charged offense of premeditated murder and instead found him guilty of second degree murder. Thereafter, the trial court conducted a sentencing hearing at which the defendant, his wife and his first cousin testified that the defendant was a person of good character and was capable of rehabilitation. The defendant continued to maintain the veracity of his trial testimony. The state presented the testimony of the victim's mother, brother and friend regarding the impact of the victim's death, the victim's struggles to overcome drug addiction, and the victim's positive traits. After hearing the evidence, the court imposed a maximum, 25-year sentence. Following an unsuccessful motion for new trial, the defendant perfected this appeal.

# I

In his first issue, the defendant challenges the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and

circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id.* at 835. In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said, "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id.* at 914.

The defendant contends that the evidence does not support a verdict of second degree murder. Rather, he claims, he is guilty of no crime greater than voluntary manslaughter, a lesser-included offense of second degree murder. Second degree murder, as pertinent to this appeal, is defined as a knowing killing. *See* Tenn. Code Ann. § 39-13-210(a)(1) (1997). Voluntary manslaughter, on the other hand, "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997).

The defendant's second degree murder versus voluntary manslaughter argument focuses on the concept of malice. He claims that there is insufficient evidence of malice, that being the distinguishing characteristic of second degree murder as compared with voluntary manslaughter. Historically, malice was an element of second degree murder, whereas voluntary manslaughter was distinguished by the absence of malice. *See, e.g., State v. Williams*, 38 S.W.3d 532, 536 (Tenn. 2001). However, with the enactment of the 1989 Criminal Code, second degree murder lost its malice requirement. *Id.* Thus, the defendant's argument regarding the presence or absence of malice is ineffectual in resolving the sufficiency-of-the-evidence issue before us.

Analyzing the facts of this case under the applicable law, we conclude that the evidence sufficiently establishes the crime of second degree murder. Circumstantially, the evidence

shows that the defendant had sexual relations with the victim and that the defendant, who was much larger than the victim, had only a superficial cut on his finger, whereas the victim had numerous contusions, abrasions and lacerations in addition to the fatal gunshot wound. Moreover, as the victim was dying from her gunshot wound, the defendant removed her from his truck and left her to die despite his certification as a nursing assistant and his admitted knowledge of cardiopulmonary resuscitation. In attempting to explain the critical events, the defendant offered many different and conflicting accounts, which the jury was free to, and obviously did, reject. The weapon with which the victim was shot belonged to the defendant. It had a safety mechanism to prevent accidental firing, and it required eight pounds of trigger pull pressure to fire. The defendant claimed in a pre-trial statement that he was unable to start the truck after the victim was shot. The jury may reasonably have concluded that he had initially planned to leave the scene after disposing of the victim's body and her purse, but when he was unable to start his truck he concocted the accounts he gave law enforcement officers shortly after the crime. From all of this evidence, the jury was within its province in determining that all of the defendant's various explanations for the victim's death were incredible, and instead, the defendant committed a knowing killing of the victim.

## II

The defendant also takes issue with the maximum, 25-year sentence ordered by the trial court. He claims that the court improperly enhanced his sentence via an inapplicable enhancement factor and failed to reduce the sentence in consideration of several mitigating factors that the court declined to apply.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. *See* Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In felony sentencing, the trial court has an affirmative duty to state on the record, either orally or in writing, which enhancement and mitigating factors it found and its findings of fact. Tenn. Code Ann. §§ 40-35-209(c), - 210(f) (Supp. 2000); *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998); *State v. Russell*, 10 S.W.3d 270, 278 (Tenn. Crim. App. 1999).

The defendant's crime is a Class A felony, and his Range I classification mandates a sentence of fifteen to 25 years. See Tenn. Code Ann. § 39-13-210(b) (1997) (Class A felony); Tenn. Code Ann. § 40-35-112(a)(1) (1997) (range of fifteen to 25 years). For Class A felony sentencing where there are both enhancement and mitigating factors, the sentencing determination begins at the midpoint within the range, and the sentence is enhanced as appropriate for the enhancement factors and then reduced as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e) (Supp. 2001).

The trial court found that the length of the defendant's sentence should be enhanced because the victim was treated with exceptional cruelty and the crime involved the use of a firearm. *See* Tenn. Code Ann. § 40-35-114(5), (9) (Supp. 2001). The court mitigated the sentence based upon the defendant's lack of a prior criminal record. Tenn. Code Ann. § 40-35-113(13) (1997).

The defendant concedes that the firearm enhancement factor is appropriate. He complains, however, that the court should not have applied the exceptional cruelty factor. The precise language of that factor is, "The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5) (Supp. 2001). This was, as the trial court noted, a brutal crime. The victim was beaten with a wooden club so violently that splinters of wood broke off the club, was shot in the face, and during her last living minutes was dragged nude out of the cab of a tractor-trailer truck, down metal stairs, and across a gravel surface. The defendant claims that the blows were inflicted in self-defense and the dragging was attendant to removal of the body after the crime. However, both the jury at trial and the judge at sentencing rejected the defendant's self-defense theory. Furthermore, the victim was still alive when she was dragged from the cab of the truck. We are unpersuaded that this factor should not have been applied.

Turning to the defendant's argument relative to mitigating factors, we are unpersuaded that the court should have allowed additional mitigation based upon strong provocation, the defendant's age of 24, any assistance to authorities, lack of sustained intent to violate the law, and self-help rehabilitative efforts.

The court allowed some mitigation based upon the defendant's lack of a prior criminal record, although it afforded this factor less than substantial weight because the crime was a serious, brutal one. *See* Tenn. Code Ann. § 40-35-113(13) (1997).

The court rejected the strong provocation mitigating factor based upon the brutality of the crime. *See* Tenn. Code Ann. § 40-35-113(2) (1997). In this regard, it is noteworthy that the judge and the jury rejected the defendant's claim of self-defense. Moreover, the defendant had a very minor finger injury in contrast with the victim's devastating injuries. *State v. Edwin Jesperson*, No. 03C01-9206-CR-00212, slip op. at 25 (Tenn. Crim. App., Knoxville, Aug. 11, 1993) (jury's rejection of defendant's claim of adequate provocation required for voluntary manslaughter militates against his sentencing bid for mitigation based upon strong provocation), *perm. app. denied* (Tenn. 1993).

With respect to the defendant's age, the court found that at the age of 24, he was "old enough to have a little judgment." In order for this mitigating factor to apply, the court must find that "[t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense." Tenn. Code Ann. § 40-35-113(6) (1997). The evidence did not demonstrate that the defendant had any age-related judgment deficit. *See State v. Adams*, 864 S.W.2d 31, 33 (Tenn. 1993) ("In determining whether this factor is to be applied, courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or

development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct."). To be sure, the evidence demonstrated that the defendant had been a responsible, hard-working, well-respected young man in his teens and early twenties.

The defendant also argues that the court should have assigned mitigating value to evidence of the assistance he provided to the authorities. *See* Tenn. Code Ann. § 40-35-113(10) (1997). The court observed that the defendant had assisted the authorities in locating the victim; however, it balanced that fact with the fact that the defendant was untruthful with the authorities about his role in the crime. We believe that the defendant's initial attempts to lay blame for the victim's death on an unidentified third person and other misrepresentations negate any real consideration to which he might otherwise be entitled for bringing the crime to the attention of the authorities. *See State v. Ricky A. Burks*, No. M2000-00345-CCA-R3-CD, slip op. at 30 (Tenn. Crim. App., Nashville, May 25, 2001) (mitigating factor (10) afforded no more than *de minimus* weight when defendant made initial report to authorities about location of victim's body and voluntarily came to police station but did so as part of plan to thwart his discovery as perpetrator of crime).

The defendant also bids for mitigation based upon a claim that the offense was committed under such unusual circumstances that it is unlikely that he was motivated by a sustained intent to violate the law. *See* Tenn. Code Ann. § 40-35-113(11) (1997). We believe that the only possible "unusual circumstances" raised by the evidence in this case is the possibility of self-defense. Unfortunately for the defendant, the court rejected that theory, and we are not positioned to revisit that factual determination. The evidence accredited by the jury at trial and the judge at sentencing demonstrated a brutal beating and killing followed by the defendant's efforts, albeit unsuccessful, to deflect blame from himself. We acknowledge, as the defendant advocates, that the defendant's background is unmarred by prior criminal convictions or known criminal behavior. However, we do not consider a young defendant's lack of a prior criminal record, standing alone, indicative that a crime was committed under unusual circumstances justifying the application of this mitigating factor. Moreover, the court allowed the defendant some mitigation for his lack of a prior criminal record.

Finally, the defendant claims that he should be allowed mitigation because he has attempted to rehabilitate himself and to help others since the crime. *See* Tenn. § 40-35-113(13) (1997). The defendant testified that he has taken classes while incarcerated and tutored other prisoners toward passing the G.E.D. examination. Significantly however, the defendant testified at the sentencing hearing that his trial testimony was truthful and continued to characterize the victim's death as accidental. His failure to accept responsibility for the crime speaks loudly about his prospects for rehabilitation.

Thus, we conclude that the trial court properly applied enhancement and mitigating factors. In balancing these factors, the court found that the enhancement factors "very heavily outweighed" the mitigating factor. Remembering that the court began with the mid-point of the

fifteen to 25-year range applicable to the defendant, *see* Tenn. Code Ann. § 40-35-210(e) (Supp. 2001), we conclude that the court did not err in imposing a maximum, 25-year sentence.

In conclusion, the evidence is sufficient to support the defendant's second degree murder conviction, and the defendant was properly sentenced to a maximum, 25-year term. The judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE