IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. ALBERT JACKSON

**Appeal from the Criminal Court for Shelby County**
No. 12-05328    W. Mark Ward, Judge

No. W2014-00050-CCA-R3-CD  - Filed December 30, 2014

The defendant, Albert Jackson, was convicted by a Shelby County Criminal Court jury of attempted voluntary manslaughter, a Class D felony; aggravated assault, a Class C felony; employing a firearm during the commission of a felony, a Class C felony; reckless endangerment with a deadly weapon, a Class E felony; and felon in possession of a handgun, a Class E felony.  He was sentenced to an effective term of twenty-four years in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal), Amy G. Mayne and Jane Sturdivant Tillman (at trial), Assistant Public Defenders, for the appellant, Albert Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for attempted second degree murder, aggravated assault, employing a firearm during the commission of a felony, reckless endangerment with a deadly weapon, and felon in possession of a handgun, as a result of his pulling a gun on the driver

and front seat passenger of a car in which he was riding.

## State's Proof

Marquita Lee testified that, on April 7, 2012, she was at her house with her friends, "Red" and "Amber," as well as her two-year-old son, Marjavius. Red had asked Lashun Peete to drive the women to the nail salon, and Peete arrived to pick them up. When Peete arrived, Keunshay Cooper was with him. Lee had known Peete for approximately ten years and was familiar with Cooper through Peete. Lee, her friends, and son got into the car with Peete and Cooper, and Peete drove Red and Amber to the nail salon. Lee asked Peete to drive her to a bail bondsman because she needed to deposit money for her sister's bond.

Lee testified that Cooper became angry at Peete because he gave Red $20 to get her nails done, and she hit Peete on the back of the head. Peete and Cooper continued to argue, and Cooper told Peete to drop her off somewhere. Cooper texted with someone who was supposed to meet her at University Cabana, but Peete wanted to meet at a gas station instead. They stopped at a gas station convenience store, but whoever was picking up Cooper did not show up so Peete drove her to the Tillman Cove Apartments.

Lee testified that, when they pulled into the Tillman Cove Apartments, the defendant exited a small black car, and Cooper, who exited Peete's vehicle, hugged and kissed the defendant. The defendant then got into the backseat of Peete's vehicle and spoke with Peete, while another man, who was with the defendant, asked for a ride to go pick up his child. Lee became suspicious of the other man's need for a ride considering he just got out of a car. However, Cooper told Peete that the man was "okay," and Peete agreed to give him a ride. At that point, the defendant said that he was not going to join them, but the other man instructed him to come. The defendant and the other man were in the backseat with Lee's son, and Lee was in the front passenger seat.

Lee testified that, as they pulled away, she noticed one of the men in the backseat motion "come on" to a burgundy Dodge Charger partially painted with primer that was parked across the street. In order to avoid detection, Lee texted Peete that they were being followed by the Charger. The defendant's companion gave directions to Peete, and Peete asked the men if they knew they were being followed. The men denied that they were being followed, and Peete pretended to call his cousin who lived in the area. Peete pulled up to a house and acted like he knew the people who lived there, although he did not. He got out of the car and, again, pretended to call his cousin.

Lee testified that the defendant and the other man also got out of the car when Peete exited the vehicle. The defendant asked Peete why they had stopped and said, "I don't want

-2-

to be in no shoot-out." Lee said that Peete did not have a gun, and she had not seen the defendant or the other man with a gun at that point in time. All three men got back into the car, and Lee brought her son into the front seat with her because she felt uneasy about what was going on. The defendant's companion instructed Peete to turn right, but Peete said that he would not turn right because it was a dead-end. Peete turned left instead, and the defendant said, "fuck this shit" and pulled out a gun. As the defendant tried to insert the clip into the gun, he and Peete started "tussling over the gun" and Peete eventually "pull[ed] the clip out." During the ordeal, the car was still moving at a "normal speed," and the gun was pointed at Lee and her son. Lee, who was nervous and scared, tried to open the car door to jump out, but it was locked. The men were still struggling over the gun when Lee heard two clicking sounds, but the gun was jammed. Lee then jumped from the moving car with her son in her arms, just as the car hit a pole and the door swung back and hit her son on the head.

Lee testified that, after she jumped from the car, she looked back and saw the defendant holding the gun and walking to the red Charger that had been following them. She also saw Peete fighting with the other man. Lee said that she sustained abrasions all over her leg and hurt her back jumping from the car. Her son sustained a gash to his forehead from the door hitting him, as well as a big knot on the back of his head. After she was transported to the hospital, Lee spoke with Sergeant Perry and provided a written statement. She identified the defendant from a photographic array as the man who held the gun.

On cross-examination, Lee recalled that the defendant's gun did not have a clip in it when he pulled it but that he tried to put it in the gun. She also recalled that it was the defendant's companion who motioned to the Charger and not the defendant.

Lashun Peete testified that he previously dated Keunshay Cooper and that, at the time of the crimes, they had been broken up for approximately one month. On April 7, 2012, he picked up Lee and two of her friends to take them to a nail salon, when Cooper called asking him for a ride. Because he was nearby, he agreed to pick her up as well. He dropped off Lee's two friends at the nail salon, and one of them asked for money to get her nails done. Peete gave her $15, which angered Cooper and she pushed him in the back of his head. They proceeded to argue, and Peete told her that he was going to take her back to where he had picked her up.

Peete testified that he proceeded to drive back to where he had picked up Cooper, but no one was home. Cooper called and texted someone, but no one arrived. Peete told Cooper that he would take her close to her house, but he would not take her all the way there. En route, they stopped at a gas station where they waited for someone to meet Cooper, but no one arrived. Cooper calmed down, and Peete agreed to take her to the Tillman Cove

Apartments. When he pulled up to the curb at the apartment complex, the defendant and another man approached the car while Cooper held the door to the car open as though she was stalling for time. The defendant asked for a ride, claiming that it was an emergency because he needed to pick up his baby. Peete had met the defendant on one prior occasion about a month before when Peete showed up at Cooper's house late at night and the defendant opened the door and told him that she was not at home. Peete also knew the defendant's brothers.

Peete testified that he agreed to give the defendant a ride, although he thought it was going to be the defendant and Cooper, not the defendant and the other man. Peete told the men that he was familiar with the area and asked where they needed to go, but they refused to tell him and instead gave him step-by-step directions. As they were driving, Peete received a text message from Lee telling him that a red car was following them, which he also noticed. He described the vehicle as a red Charger with black paint as though it had been wrecked. Peete made a left turn and pulled over to see what the red car would do, and it pulled over approximately four car lengths behind him.

Peete testified that the defendant and his companion "start[ed] acting real paranoid [and] hostile," so he pretended to know the person who lived in the house where he had stopped. He thought that they would not do anything to him if they believed people were around. He got out of the car and pretended to talk on the phone to whoever lived in the house, and he heard the defendant and his companion say they did not want to be in a "shootout." Peete did not have a gun. When he asked the men if they knew who was following them, they acted "real paranoid" and told him to get back into the car.

Peete testified that he got back into the car, and the defendant told him to make a right turn. Instead, Peete turned left because there was a dead-end to the right. The defendant "got real mad and said, 'fuck this.'" Peete saw the defendant pull "a big automatic weapon with a long extended clip" out of his pants, which he put to the back of Peete's head and told him to "'drive straight, don't turn til I say turn.'" Peete went to pull on his seatbelt and, as he did so, reached around and grabbed the defendant's gun. Peete and the defendant began to "tussle," and Peete let go of the steering wheel. As he and the defendant struggled over the gun, Peete heard the gun click two or three times without firing. The defendant pointed the gun at Lee and her son, and the defendant, his companion, and Peete all struggled over the weapon. Peete recalled that the defendant said, "I'm going to shoot, I'm going to shoot" during the struggle. Peete "snatched the clip out" of the gun and, at virtually the same time, Lee and her son jumped out of the car, and the car hit a curb and ran into a pole. The defendant hit Peete two or three times on the head, then ran to the red Charger. The defendant's companion fought briefly with Peete, looked for something in Peete's car, and then also ran to the red Charger.

-4-

Peete testified that he later gave a statement to the police and identified the defendant out of a photographic array. Peete said that he suffered injuries to his neck, back, and hand as a result of the incident. He identified the extended clip with extra bullets that he took out of the defendant's gun. He reiterated that, during his and the defendant's struggle over the gun, he "heard it click . . . a couple of times like he tried to shoot," and the defendant was saying, "I'm going to shoot" as they were fighting over the gun.

Scott Sturgeon was visiting his girlfriend on April 7, 2012. He was mowing the lawn when he heard a big crash, so he left the mower running and went to look around the corner to see what had happened. Upon seeing that a car had struck a telephone pole, he ran back to his lawnmower to shut it off and then returned to the crashed vehicle. Back at the crash site, Sturgeon saw "a guy on top of another guy hitting him on the top of the head." He also saw a woman walking away from the car with a baby. He ran inside to get a piece of paper in order to take down the license plate number and, when he returned, he saw a burgundy Dodge Charger with primer on the fender speeding away. He wrote down the license plate number of the Charger and provided it to the police.

Alan Rogers testified that he was driving on April 7, 2012, when he saw "a small car that's crashed into a telephone pole, and at the back of that car there's a guy getting his head slammed on the trunk." He also saw a red Dodge Charger with the hood and front quarter panels "blacked out." Rogers blew his car horn and started to exit his vehicle, when two men standing near the Charger gestured like they had a gun. The man who was slamming the other man's head on the trunk walked to the Charger, all three men got into the car, and they sped away. Rogers called 911 and followed the Charger. The car eventually stopped in front of a house, the men raised the hood of the vehicle to examine something, and then got into a different vehicle and drove away.

Sergeant Ron Perry with the Memphis Police Department testified concerning his investigation of the case. Gail Rankins, the keeper of records with the Shelby County Criminal Court Clerk's Office, testified concerning the defendant's history of convictions.

**Defendant's Proof**

The defendant testified that he previously dated Keunshay Cooper and spoke to her on the day of the incident around 11:00 a.m. and noon. He claimed that he called her to see if she knew where he could buy some high-grade marijuana, and she told him that Peete had some. The defendant elaborated that the marijuana was for an acquaintance, "Pooh," who was in the car with him at the time, and that he told Pooh a higher price than that requested by Peete in order to make a profit from the transaction. They agreed to meet at the Tillman

Cove Apartments.

The defendant testified that they met as planned, and Pooh got into the car with Peete. Pooh told the defendant to get into the car as well because Peete did not want to conduct the transaction in front of the cameras at the apartments. The defendant got into the car, and they drove away. The defendant recalled that Pooh tried to pay Peete with counterfeit money and the men began to argue. During the fight that ensued, Peete let go of the steering wheel and the car jumped the curb. The defendant claimed that he told Lee to grab the steering wheel but she, instead, grabbed her son and jumped out of the car. The car hit a pole, but Pooh and Peete continued to fight. The defendant grabbed the marijuana and ran to a red car that had been following them, driven by Pooh's girlfriend. Pooh stopped fighting with Peete and ran to the red car as well, and they left quickly. The defendant denied that he or Pooh had a gun. He said that the marijuana he stole weighed about a pound and was worth $4,800.

The defendant claimed that his mother told him that the police were looking for him, and he went to the police station voluntarily. He admitted that he lied to Sergeant Perry about his involvement in the incident because of his parole status. However, he said that had he known Peete "was going to concoct such a preposterous story," he would have been truthful with the police despite the risk of a parole violation.

Following the conclusion of the proof, the jury convicted the defendant of attempted voluntary manslaughter, aggravated assault, employing a firearm during the commission of a felony, reckless endangerment with a deadly weapon, and felon in possession of a handgun. The trial court merged the aggravated assault conviction into the attempted voluntary manslaughter conviction for purposes of sentencing, and sentenced the defendant to an effective term of twenty-four years.

## ANALYSIS

The defendant challenges the sufficiency of the convicting evidence. He specifically argues that: the evidence is insufficient to establish the element of adequate provocation for the offense of attempted voluntary manslaughter, the proofs fails to establish the existence of a predicate offense for the offense of employing a firearm during the commission of a dangerous felony, and the evidence fails to establish that the victims were placed in imminent danger of death or serious bodily injury pertinent to the offense of reckless endangerment.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson

v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant first argues that the evidence is insufficient to establish the element of adequate provocation for the attempted voluntary manslaughter of Lashun Peete. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense":

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a). The jury is responsible for reviewing the evidence to determine whether it supports a finding of adequate provocation. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001).

In the light most favorable to the State, the proof at trial showed that Peete agreed to give the defendant and his companion a ride, during which he noticed they were being followed by a red Dodge Charger. When Peete questioned the defendant and his companion about their being followed, the men "start[ed] acting real paranoid [and] hostile." Peete pulled over at a house, pretending to know the person who lived there, in an attempt to discourage the men from attacking him. While he was out of the car, Peete heard the defendant and his companion say that they did not want to be in a "shootout," although Peete did not have a gun. Peete asked the men if they knew who was following them, and they acted "real paranoid" and told him to get back into the car. Once Peete was back in the car, the defendant became angry and frustrated when Peete refused to follow an order to drive down a dead-end street and instead turned the opposite direction. The defendant pulled out a gun to force Peete to comply and, when Peete fought with the defendant and struggled for control over the gun, the defendant attempted to shoot Peete. From the proof, a rational trier of fact could have found that Peete's refusal to obey the defendant and the struggle that ensued between the defendant and Peete over control of the defendant's gun adequately provoked the defendant to try to kill Peete.

The defendant next argues that the proofs fails to establish the existence of a predicate offense for the offense of employing a firearm during the commission of a dangerous felony. In Tennessee, it is a crime to employ a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1), (2). Attempted voluntary manslaughter is defined as a dangerous felony. Id. § 39-17-1324(i)(1)(C), (M). The defendant asserts that because, as he argues above, there is insufficient proof of the element of adequate provocation for the predicate offense of attempted voluntary manslaughter, his conviction for employing a firearm during the commission of a dangerous felony must be dismissed. In light of our determination that the evidence is sufficient to support the defendant's conviction for attempted voluntary manslaughter, this issue is without merit.

The defendant lastly argues that the evidence fails to establish that the victims, Marquita and Marjavius Lee, were placed in imminent danger of death or serious bodily

injury pertinent to the offense of reckless endangerment. A person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Id. § 39-13-103(a). Reckless endangerment committed with a deadly weapon is a Class E felony. Id. § 39-13-103(b). To demonstrate an imminent danger of death or serious bodily injury, the State must show that a person or class of persons was "placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999).

The defendant asserts that, because the gun was unloaded, the victims were not placed "in a reasonable probability of the imminent danger of death or serious bodily injury by use of a deadly weapon." However, Peete's testimony indicates that he heard the defendant's gun click two or three times and saw the defendant point the gun at Lee and her son before Peete "snatched the clip out" of the gun. In addition, the defendant's brandishing of a gun and attempts to shoot it caused Lee to jump out of a moving car with her small child, causing injuries to both herself and her child. Moreover, a rational trier of fact could reasonably conclude that the mere act of brandishing a weapon on the driver of a moving vehicle put the passengers inside the vehicle in a reasonable probability of imminent danger of death or serious bodily injury.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE