# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 1, 2013

## STATE OF TENNESSEE v. MICHAEL WADDELL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-07520      Chris Craft, Judge**

---

**No. W2012-01910-CCA-R3-CD  - Filed December 18, 2013**

---

A Shelby County Criminal Court Jury convicted the appellant of second degree murder.  The trial court sentenced him as a Range II, multiple offender to thirty-seven years in the Tennessee Department of Correction.  On appeal, the appellant contends that the evidence is not sufficient to sustain his conviction of second degree murder.  He argues that the jury should have found that he was acting in self-defense or, in the alternative, that he committed voluntary manslaughter. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Claiborne H. Ferguson (on appeal) and John L. Dolan (at trial), Memphis, Tennessee, for the appellant, Michael Waddell.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel, Amy P. Weirich, District Attorney General; and Abby Wallace and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's conviction resulted from the shooting death of the victim, Shayla Harris.  At trial, Clarence Scott, IV, testified that he lived at 2753 Browning Street, near

Joslyn Clemmons,[1] who was the victim's aunt. Scott had known the appellant for several years and had bought drugs from him. Before dark on the evening of June 30, 2009, Scott was in his house smoking crack cocaine with some friends when the appellant and the appellant's brother, Felt,[2] came to the house. The appellant told Scott "'can't nobody else sell drugs on the street.'" Felt demanded that Scott pay him, then he and the appellant told Scott to leave the house and get the money. Because both men had pistols, Scott left the house. He saw the victim and her boyfriend, Aubrey Lynn Taylor, sitting in a car in the driveway.

Scott said that he went to his parents' house next door and stood in front of the residence. After the appellant and Felt left, Scott returned to his house. The victim and Taylor were still in the driveway. Three to five minutes later, Scott heard the victim and Taylor start their car and drive away. Approximately five minutes later, Scott heard a gunshot. He looked out his front door but did not see who had been shot. However, he saw Taylor "jumping and hollering" and saw the appellant running away. Shortly thereafter, the police arrived and secured the scene.

On cross-examination, Scott said that he used, but did not sell, drugs. Scott acknowledged that on the day of the shooting he had smoked crack cocaine for at least six to eight hours, but he maintained that he "wasn't that cloudy."

Scott said that he knew the victim had been shot when he saw Taylor "running back and forth shouting 'he shot my baby.'" Scott did not see an altercation between the victim and the appellant.

Joslyn Clemmons testified that she lived at 2738 Browning Street and that the appellant lived in a rooming house approximately four houses down the street from her. She described the appellant as "a violent type guy."

Joslyn said that on June 30, 2009, she saw the appellant "practically throughout the day ranting and raving, ranting and raving up and down the street . . . [c]ussing and fussing at everyone, anyone." At approximately 3:30 or 4:00 p.m., the victim, who was driving a white, 2003 Chevrolet Malibu, came to visit her. Joslyn's nephew, Antoine; her son, Eric; her three-year-old grandson; and the victim's friend, Penny, were also at the house. Joslyn looked outside and saw the appellant's brothers, Eric and Felt. The appellant was standing

---

[1]Joslyn Clemmons is also referred to as "Joyce Clemmons" in the record.

[2]Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

down the street in the yard of a house that had burned, and a blue, four-door Cadillac was parked in the grass. A woman and two or three children were with the appellant and his brothers.

Joslyn said that the victim left the house to drive her mother to work and returned thirty or forty-five minutes later. The victim's boyfriend, Taylor, was with her, and they parked in Joslyn's driveway. When they arrived, Joslyn was standing at the front door. The appellant was wandering the street near Joslyn's driveway, "ranting and raving, waving a gun." Joslyn told the appellant to get away from her house and that she was going to call the police. When she picked up the telephone to call 911, the appellant raised his gun. Joslyn said, "[D]on't you do that, Mike." The appellant disregarded her statement, "raised that gun up and put that gun in [the victim's] face and shot [the victim]." The appellant said, "'I didn't like that bitch no way.'"

Joslyn said that after the shooting, the appellant, his brother, the woman, and the children got into the Cadillac and drove away, running over curbs and garbage cans. Joslyn did not see Antoine or the victim have any interaction with the appellant.

On cross-examination, Joslyn said that the shooting occurred at night while it was dark. A streetlight was by the curb across the street, and her next door neighbor had a bright light on a pole at the end of his driveway.

Joslyn acknowledged that in her statement to the police, she initially said that she did not see "him" with a gun. She explained that she "was just mad and wanted to get out [of] the police station because I was so mad I wanted to kill him myself." She denied that she would lie in order to mislead the jury.

On redirect examination, Joslyn clarified that when she told the police that she did not see "him" with a gun, she was referring to the appellant's brother Eric, not the appellant. After reviewing her statement, she recalled that she told the police she saw the appellant with a "big gray looking gun, gray, silver/grayish, a fat gun" and that she saw him shoot the victim with that gun.

Antoine Clemmons, the victim's older brother, testified that he arrived at Joslyn's house around 9:00 p.m. so that the victim could drive him to his mother's house. When he arrived at the residence, Joslyn, Penny, Joslyn's son, and Joslyn's grandson were in the yard. Gladys Mitchell, a neighbor who lived to the right of Joslyn, was on her porch with Bernard Clemmons, Steve Lloyd, and Felt. The appellant was in Mitchell's yard. Antoine said that he had no contact with the appellant at that time.

Antoine said that approximately thirty-five minutes to one hour later, the victim and Taylor came to Joslyn's house. Taylor was driving the victim's Malibu. When they arrived, Antoine was sitting on Joslyn's porch with Penny, and Joslyn was standing in the doorway. The victim asked Antoine if he was ready to leave. He said yes and walked off the porch. When Antoine reached the end of the driveway, the appellant approached him, carrying a chrome and black semiautomatic Glock pistol in his hand. The appellant pushed Antoine and said, "[W]hat you trying to do to me, you're trying to do something to me, trying to work up on me or something to that sort." Antoine asked the appellant what was wrong, told him to "chill," and cautioned the appellant not to do something he would regret.

Antoine said that as he and the appellant talked, they walked down the street away from Joslyn's house. When Antoine arrived at a neighbor's porch "two doors down," he turned around and noticed the appellant was near the front of Joslyn's yard. A fight "broke out" between the appellant and the victim, with both individuals "swinging" punches. The appellant used both hands to strike the victim. Antoine said that the victim was "throwing blows" at the appellant to defend herself. During the fight, Antoine saw the appellant fire the Glock in the victim's face. Antoine began running toward the fight, and saw the victim fall to the curb. The appellant stood in place "like in disbelief," saying nothing. Antoine grabbed the victim, saw that she was bleeding, but could not tell where she was injured. The appellant left before the police arrived.

On cross-examination, Antoine said that he did not know whether the appellant and the victim were "having words as they [were] fighting." Antoine acknowledged that he said in his statement to the police:

> "I was sitting on the porch when [the victim and Taylor] approached me and asked if I was ready to go home for the night. The shooter took in content that something was being said to him and it was not. By then I leave the porch and walked out towards the fence and he pushes me."

Antoine said that he saw the appellant strike the victim several times in the face with the gun before the appellant fired the gun. Antoine told the police that he was not sure if the appellant "was trying to shoot over [the victim's] head to scare her."

Antoine stated that he and the appellant had been close friends prior to this incident. He said that before the victim got out of her car, he heard Joslyn and the appellant "have words with each other." Antoine said, "Whatever caused them to be in a physical fight I don't know, but I know [the victim] wouldn't have not proceeded to do anything to him unless done upon."

-4-

On redirect examination, Antoine said that he told the police that the appellant "'took the pistol and cocked it and swung it at her, then swung it again and pointed it at her face and squeezed the trigger. I don't know if he was trying to shoot over her head but he shot her.'" Antoine also told the police that the appellant "'couldn't have been trying to shoot her over the head because he aimed at her face and pulled the trigger and walked off.'" Antoine said that the appellant intended to shoot the victim and that the appellant walked away without saying anything after the shooting.

On recross-examination, Antoine said that the appellant and the victim fought for twenty or thirty seconds. He acknowledged that he did not see anything that would have prevented either the victim or the appellant from retreating.

Aubrey Lynn Taylor, the victim's boyfriend, testified that around 2:00 or 3:00 p.m. on June 20, he and the victim went to Joslyn's house in the victim's white Malibu. At some point that afternoon, Taylor went to a nearby house and played dominos with Felt. Later that night, the victim drove her mother to work. On her way back to Joslyn's house, the victim picked up Taylor. As they were returning to Joslyn's house, they stopped to retrieve Taylor's cellular telephone, which had been charging at Scott's house. Taylor parked in Scott's driveway and went inside to get his telephone while the victim waited in the car. Six or seven people were in Scott's residence, smoking crack. They told Taylor that "something's fixing to happen, [the appellant] and them coming over here." Taylor did not think much about the remark until the appellant, Felt, and Eric walked onto Scott's porch. The appellant pointed a pistol at Scott, and the brothers told everyone to leave the house. The appellant called Scott a "b[*]tch," but he said nothing to Taylor. Taylor left the house and got into the car with the victim. As they were driving away, they saw the appellant and Felt walk toward Joslyn's house. Scott said that he drove to Joslyn's house to get Antoine.

Taylor said that they returned about two minutes later and saw the appellant standing at the edge of Joslyn's driveway. Eric walked into Joslyn's yard, and Felt walked toward Mitchell's house, which was two houses down from Joslyn's house.

Taylor said that the car's rear window was down and that he told Antoine, who was waiting on Joslyn's porch, to get into the car. As Antoine walked toward the car, the appellant "jumped up with his gun," accused Antoine of "running up on [him]," and pointed a chrome and black .40 caliber gun at Antoine's stomach. Antoine pushed the gun away. The victim said, "[O]h, no, he's doing that to my brother," and started to get out of the car; however, Taylor persuaded her to stay in the car. Antoine returned to the porch, and the victim and the appellant argued through the car's window. Taylor could not hear what the appellant said. Taylor told the victim to remain in the car because the appellant was only "showing out."

Taylor said that Antoine walked off the porch, put his arm around the appellant, and they walked toward Mitchell's driveway. The victim told Taylor that she was going to get Antoine. As she tried to get out of the car, Taylor grabbed her shirt. The shirt ripped, and the victim got out of the car. Antoine was walking slightly ahead of the appellant. When the victim caught up with the appellant, he told her, "[D]on't run up on me," and he "faked" like he intended to hit her with his gun. Taylor said that the victim's

> reaction just pat! – like hit [the appellant] and he swung. He swung with the gun, I think he caught her one time across the head and he was swinging and she was blocking it, they was swinging and blocking til they got back with me. She's backing up and I'm telling her, I jumped on her about the car.

Taylor got between the appellant and the victim, and the fighting ceased. Taylor told the appellant, "[M]an – you going for my girl." At that time, the appellant cocked his gun and shot the victim in the face.

On cross-examination, Taylor acknowledged that the victim threw the first punch. During the altercation, the appellant and the victim "swung" at each other but most of the punches did not make contact; the appellant hit the victim "probably" twice on the head. Taylor said the victim knew the appellant had a gun.

Taylor said that he was in Scott's driveway around 10:40 p.m. Taylor acknowledged that he sold drugs at the time of the shooting and that he had been convicted of drug offenses.

On redirect examination, Taylor said that the victim did not sell drugs.

Patricia Harris, the victim's mother, testified that on the day the victim died, the victim took her to work. Approximately one and one-half hours later, someone called Ms. Harris and informed her of the victim's death. The victim was twenty-four years old.

Memphis Police Officer Bob Parker, Jr., testified that on June 30, he was on patrol in the area of Pendleton and Browning. He heard a gunshot but could not tell the direction from which the shot was fired. Shortly thereafter, a 911 call was placed from 2738 Browning Street. When he arrived at the scene, he saw a black man holding a woman in his arms and screaming. Officer Parker attempted to discern the location of the shooter, secured the area and called for an ambulance. Other officers arrived, and they interviewed witnesses.

Memphis Police Sergeant Joseph Benya testified that on June 30, he and Sergeant Edwards went to 2738 Browning Street to secure the scene of the shooting. The victim was

still at the scene at the time they arrived. Sergeant Benya interviewed Joslyn, "established a suspect," and left the scene to compile a photograph array.

Sergeant David Payment, a crime scene investigator with the Memphis Police Department, testified that on June 30, he went to 2738 Browning Street to collect evidence and photograph the scene. Sergeant Payment saw the victim, covered by a sheet, on the sidewalk on the west side of the driveway. Paramedics had pronounced the victim dead. When Sergeant Payment uncovered the victim, he saw that she was lying on her back and left side. Blood was on the sidewalk around her. The first officers at the scene had placed plastic cups over potential evidence to protect the evidence from contamination. On and around the driveway, Sergeant Payment found a live .40 caliber Smith and Wesson Winchester round, a spent .380 caliber bullet casing, and a yellow-colored earring that possibly belonged to the victim.

Memphis Police Sergeant Michael Garner testified that in the late afternoon of July 1, 2009, he was a member of the six-person team that went to the Bellevue Inn to apprehend the appellant. The manager told the officers that someone matching the appellant's description was staying in room 117. The manager opened the door for the officers, and Sergeant Garner saw the appellant inside room 117, lying on the bed. The officers arrested the appellant.

On cross-examination, Sergeant Garner said that the appellant did not give the officers any trouble during the arrest. No weapons were found on the appellant.

Dr. Miguel Laboy testified that he performed the autopsy on the victim's body and determined that the victim died from a gunshot wound to the head. Dr. Laboy "recovered a deformed medium calib[er] jacketed bullet [from] the posterior base of the skull in the brain." Due to the presence of gunpowder stippling, but not soot, around the wound and on the "white part" of the victim's eye, Dr. Laboy determined that the shot had been fired from an "intermediate range" and that the victim's eye was open when the shot was fired.

Dr. Laboy said that the victim was five feet, nine inches tall and weighed 177 pounds. She was wearing a black and white tank top, black bra, black shorts, green shoes, a yellow loop earring, a yellow metal earring, and a yellow bracelet. Toxicology testing revealed the presence of a small amount of marijuana in her system.

On cross-examination, defense counsel asked the appellant to stand and questioned whether the appellant or the victim was taller. Dr. Laboy responded, "From here it appears

that he's taller."[3]

Special Agent Cervinia Braswell, a forensic scientist with the Tennessee Bureau of Investigation's Firearms Identification Unit, testified that she was not given a weapon to examine. Regardless, she stated that with a semiautomatic pistol, "[a]s long as there's cartridges in the magazine and it's loaded into the pistol then you can fire that gun by pulling the trigger as many times until the magazine is empty." Agent Braswell said that when a bullet was fired from a distance of seven to forty-two inches, stippling but not soot would appear around the gunshot wound.

The sole defense witness, Gladys Mitchell, testified that on June 30, 2009, she lived on Browning Street a couple of houses down from Joslyn. Around 10:00 or 11:00 p.m., Mitchell was standing in her yard at the end of her driveway, talking with the victim's uncle, Harry Bernard Clemmons, when she heard a commotion down the street. She saw the appellant walking with a gun in his hand. The victim drove up in a white car, jumped out of the car, and approached the appellant. The victim started throwing "hard blows [at the appellant, and] he was throwing hard blows back at her." They struck each other "about four to six licks a piece." The fight lasted three or four seconds before Mitchell heard a gunshot and saw the victim fall. After the shot, the appellant walked away. The victim's brother and boyfriend were nearby, but neither man intervened in the fight. Mitchell said the victim was taller than the appellant.

Mitchell asserted that she had no personal interest in the outcome of the case, noting that she knew the victim's family and the appellant's family. She maintained that she had testified truthfully.

On cross-examination, Mitchell said that on June 30, 2009, she had known the appellant for five or six years. She acknowledged that earlier in the day, she saw the appellant walk up and down the street and that he "might have" said that "'this was his street.'" She said that she did not hear the statement "that particular time" but that the appellant had said something similar in the past. Mitchell said that the appellant stopped when Joslyn told him to put up his gun or she would call the police.

Mitchell said that when the appellant walked down the street she did not hear what he said because "they was saying so much they was just arguing, everybody was arguing and a lot of commotion was going on and he was walking with a gun in his hand." She said that

---

[3]We note that the appellant's presentence report reflects that the appellant is five feet, five inches tall. Regardless, the jury heard testimony regarding the victim's height and observed the appellant's height.

Antoine was in front of Joslyn's house, and Joslyn was standing in the doorway. The appellant's two brothers were somewhere along the street near Scott's house. Mitchell did not see any contact between the appellant and Antoine, and they did not come into Mitchell's yard that night. Mitchell said that the appellant may have spoken to Antoine, noting that she saw the appellant talking to a group of men and that Antoine "was probably in that group." A man named Steve told the appellant to leave the victim alone.

Mitchell said that after the victim began hitting the appellant, "he turned around and started swinging back at her. I guess – I don't know did he think that he was going to lose the fight but they got to fighting, but he turned around when she hit him he turned around and started swinging back at her." She did not see the appellant hit the victim with the gun. After the victim was shot, Antoine ran to her. Taylor started "hollering and jumping up in the air." The appellant walked away, got into a car, and left.

Mitchell acknowledged that in 2009, she signed a $100,000 surety bond for the appellant. She further acknowledged that she never told the police what she saw that night.

On redirect examination, Mitchell explained that the appellant's sister asked her to sign the bond for the appellant because Mitchell was employed.

The jury found the appellant guilty of second degree murder. The trial court imposed a sentence of thirty-seven years. The appellant's sole appellate issue is the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant complains that the proof at trial established that he committed voluntary manslaughter, not second degree murder. Specifically, the appellant contends that "[g]iven the fact that a physical fight had broken out between [the appellant] and [the] victim prior to the shooting, no rational trier of fact could have found that the killing lacked the state of passion that resulted from the adequate provocation of a heated fight."

Second degree murder is defined, in pertinent part, as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Voluntary manslaughter, which is a lesser included offense of second degree murder, is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The principal distinction between the two crimes for purposes of this appeal is the existence of adequate provocation.

Viewing the evidence in the light most favorable to the State, the proof adduced at trial is sufficient to establish that the appellant committed second degree murder. Specifically, the state's proof at trial was that on the day of the shooting, the appellant was angry because someone else was selling drugs on Browning Street, which he considered his area. The appellant and his brother went to Scott's house armed with pistols and demanded money, asserting that "can't nobody sell drugs on the street." Shortly before the victim was shot, the appellant was walking up and down the street, "ranting and raving," and waving a gun. Antoine Clemmons, the victim's brother, testified that he was at his mother's house when the victim and her boyfriend, Aubrey Lynn Taylor, arrived in the victim's Chevrolet Malibu. The victim planned to drive Antoine to work. Antoine walked from the porch to the end of the driveway, and the appellant approached him with a semiautomatic Glock pistol and pointed the gun at Antoine. Antoine cautioned the appellant to not do something he would regret, and the two walked down the street. The appellant turned around and walked back toward the victim's car. The appellant argued with the victim, and the two began fighting. Antoine testified that the appellant struck the victim in the face with the gun several times then pointed the gun at the victim's face, cocked the gun, and shot her. Afterward, the appellant walked away.

Joslyn Clemmons, the victim's aunt, witnessed the shooting. Joslyn told the appellant

to get away from her house and picked up the telephone to call the police. The appellant raised the gun, and Joslyn admonished him, "Don't you do that, Mike." Despite her warning, the appellant raised the gun, put the gun in the victim's face, and shot her. The appellant said, "I didn't like that bitch no way," and walked away.

Taylor testified that the victim and the appellant had been fighting but that the fighting had ceased when the appellant cocked his gun and shot the victim in the face.

The appellant maintains that Gladys Mitchell's testimony that the victim started the fight and that she provoked the shooting established that the appellant killed the victim while in a state of passion after reasonable provocation. However, the jury heard the proof and rejected that defense theory. "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); see also State v. Williams, 38 S.W.3d 532, 538 (Tenn. 2001). We defer to the finder of fact's evaluation of the evidence and its determination regarding the existence of adequate provocation. See, e.g., Johnson, 909 S.W.2d at 464. There is no reason for us to second-guess the jury's decision because the evidence is sufficient to support the verdict.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE